PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JIMMY L. WILSON,
                    *Plaintiff-Appellee,*

v.

PHOENIX SPECIALTY MANUFACTURING
COMPANY, INCORPORATED,
                    *Defendant-Appellant.*

No. 06-1818

JIMMY L. WILSON,
                    *Plaintiff-Appellant,*

v.

PHOENIX SPECIALTY MANUFACTURING
COMPANY, INCORPORATED,
                    *Defendant-Appellee.*

No. 06-1836

Appeals from the United States District Court
for the District of South Carolina, at Orangeburg.
R. Bryan Harwell, District Judge.
(5:03-cv-04164-RBH)

Argued: September 27, 2007

Decided: January 23, 2008

Before NIEMEYER and MICHAEL, Circuit Judges,
and T. S. ELLIS, III, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Michael wrote the majority
opinion, in which Senior Judge Ellis joined. Judge Niemeyer wrote a
dissenting opinion.

**COUNSEL**

**ARGUED:** George Andrew Harper, JACKSON & LEWIS, L.L.P., Greenville, South Carolina, for Phoenix Specialty Manufacturing Company, Incorporated. Candy Maria Kern-Fuller, DANIELSON AND KERN-FULLER LAW GROUP, Piedmont, South Carolina, for Jimmy L. Wilson. **ON BRIEF:** Robert E. Hoskins, FOSTER LAW FIRM, L.L.P., Greenville, South Carolina; Victoria L. Eslinger, NEX-SEN PRUET, Columbia, South Carolina, for Jimmy L. Wilson.

**OPINION**

MICHAEL, Circuit Judge:

Phoenix Specialty Manufacturing Company, Inc. (Phoenix) appeals the district court's determination, made after a bench trial, that the company terminated the employment of Jimmy Wilson because it regarded him as disabled by Parkinson's disease, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* We affirm this decision because there is no error in the district court's findings of fact or conclusions of law. In addition, after considering Wilson's cross-appeal, we affirm the district court's decision to deny him an award of front pay. The judgment is therefore affirmed.

I.

The district court tried this case without a jury and made the following findings of fact. Phoenix, a family-owned company with over ninety employees, makes specialty washers (perforated disks) that are used primarily in aircraft manufacturing. The company hired Wilson as its shipping supervisor in November of 1988. Ten years later he was diagnosed with Parkinson's disease, a progressive, degenerative disease of the nervous system that affects both motor and non-motor functions. On May 16, 2001, Wilson experienced a major panic attack during a meeting at work. He left immediately to see Marion Dwight, M.D., who was both the company physician and Wilson's personal physician. Dr. Dwight referred Wilson to a neurologist, Kenneth Ber-

gmann, M.D., who examined Wilson on May 24, 2001. At that time Wilson was experiencing anxiety and a loss of motor control in his right hand. Dr. Bergmann adjusted Wilson's medications and released him to return to work with no restrictions. When Wilson attempted an immediate return to his job, a Phoenix official told him that he could not return until he obtained a release from Dr. Dwight, the company physician. On or about June 4, 2001, Dr. Dwight, without examining Wilson, released him to work half days for two weeks. Without further word from Dr. Dwight, Phoenix allowed Wilson to resume full-time work around the third week of June. Notwithstanding Wilson's Parkinson's symptoms, at all times between his return to work in June 2001 and his termination in August 2002 he was able to perform the essential functions of his job.

When Wilson returned to work, he was treated differently by senior management. Harry Wise, a company vice president and Wilson's immediate supervisor, stopped his practice of joining Wilson on the loading dock for a "talk over coffee." J.A. 814. Wise "no longer met with [Wilson] and refused to look at him." *Id.* Phoenix president, Robert Hurst, avoided Wilson whenever possible. Hurst required Wilson, after every visit to the doctor, to report to Wise about his condition and the expected progression of his disease. In a June 2, 2001, e-mail to the company's human resources assistant, Hurst stated that Wilson "qualifies for ADA designation and we will have to consider accommodations." J.A. 815. Wilson in fact requested a 21-inch computer screen and help with matters that required writing. The company provided him with a 17-inch screen, the same as other supervisors. Although Wilson was eventually given some assistance in writing employee evaluations, the company made no serious effort to provide assistance with respect to writing tasks.

Phoenix believed that Wilson's Parkinson's disease rendered him substantially limited in his ability to see and perform manual tasks. In November 2001 the company installed a new, complex computer system that was used company-wide. Senior management believed that Wilson "had difficulty in adequately utilizing the information on [a] computer screen" and that he "was unable to adequately key information into a computer." J.A. 827. Indeed, the company did not provide Wilson with "substantial training [on the new] system." J.A. 815. Senior management, fearing that Wilson would make errors, barred

him from inputting data into the computer and from counting washers.

In mid-June 2002 Phoenix's officers met and discussed eliminating two salaried positions, the shipping supervisor (Wilson's job) and the press room manager, and replacing them with hourly employees. At about the same time Phoenix began looking for an additional shipping clerk. Hurst, the company president, testified that Wilson had requested another clerk, but the district court "d[id] not find this testimony to be believable," J.A. 816, finding instead that Hurst decided on his own to hire the additional clerk. The company filled the new position by hiring Stacy Nix, a twenty-five-year-old woman with limited experience. Nix began work on July 8, 2002, and spent the first three weeks in training.

On August 1, 2002, Hurst informed Wilson that the company was undertaking a reduction in force. Wilson instantly assumed that Hurst was going to terminate Nix because she was a recent hire who was still in her probationary period. Thus, Wilson was quite surprised when Hurst said that Wilson's position in the shipping department was being eliminated. Wilson, who was fifty-six years old, asked that he be allowed to stay on and work in any position, including an hourly position, but Hurst advised him that an hourly job was not available to him. (The press room manager, whose job was also eliminated, was allowed to stay on as an hourly employee.) Within minutes of terminating Wilson, the company promoted Marviette Hogan, a shipping clerk, to the newly created position of foreman of the shipping department.

At the time of his discharge in August 2002, Wilson's symptoms from Parkinson's "w[ere] stabilized by medication." J.A. 820. Dr. Bergmann had reported in February 2002 that Wilson's "disease was 'motor-wise in fairly good control' and that [he] had 'good control of his stiffness and tremor.'" J.A. 816. Wilson was still able to write at the time of his discharge, although apparently with some difficulty. He was playing golf, coaching youth sports, and driving. Wilson was never given written or oral notice that his job performance was unsatisfactory. The district court found specifically that he "was a dependable employee who often worked six to seven days a week." J.A. 813.

Wilson filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC), and Phoenix's response to the charge was introduced at trial. Phoenix claimed in its response that a downturn in sales to the aircraft industry after the events of September 11, 2001, necessitated a further reduction in its approximately ninety-person workforce in August 2002, specifically, the elimination of two supervisory positions, including Wilson's. (The company stated that it had undergone a reduction in force in June 2001.) The district court found that the reasons Phoenix gave to the EEOC for Wilson's termination were not supported by the evidence at trial. Indeed, the court found that the company did not eliminate the position of shipping supervisor, but simply changed the name of the position and promoted Hogan to fill it. The district court rejected as pretextual the following assertions that Phoenix made to the EEOC.

First, the district court discredited Phoenix's claim that it decided to implement a workforce reduction in August 2002. Wilson was not eliminated in a reduction of force, the court found, because "only two employees were involved," J.A. 816, and the company transferred the press room manager to another job.

Second, the district court rejected the company's claim that financial difficulties necessitated a workforce reduction in August 2002. The company paid bonuses to most employees in 2002. Two months after Wilson's termination Phoenix's three owners sold the company at a profit to younger family members. The sellers were paid at least $1 million for signing covenants not to compete.

Third, the district court discredited the reasons the company gave for selecting the shipping supervisor's (Wilson's) position for elimination. The company claimed that Wilson had delegated many of his job responsibilities to Hogan; that, for example, Hogan often ran shipping department meetings; and that Wilson had made no attempt to master the new computer system and could not input data. The court credited Hogan's trial testimony that she never ran department meetings and found that Wilson did not delegate his responsibilities, "but rather received some assistance in performing certain functions." J.A. 821. Hurst admitted at trial that Wilson had genuinely attempted to master the new computer system. Moreover, the district court found that the computer tasks the company complained Wilson could not do

were those "such as input of information which the [company had] specifically instructed him not to handle for fear of an entry error." J.A. 821.

Fourth, the district court did not believe the company's assertion that it looked for an open position for Wilson in the shipping department, but none was available. Likewise, the court did not believe the company's related assertion that it would have been very reluctant to put Wilson in an hourly position where he would be a "co-worker with employees who he had previously supervised with a heavy hand." J.A. 293. The district court found that the company was in need of a shipping clerk because it posted an opening for that position within two weeks of Wilson's termination. Wilson submitted an application, but the company did not respond. The court accepted the testimony of one of Wilson's subordinates who (1) denied Phoenix's allegation that she had complained about Wilson as a supervisor and (2) stated that he had been a "fair supervisor." J.A. 822.

Fifth, the district court rejected Phoenix's claim that the new shipping foreman position was non-supervisory. Nix, the new shipping department clerk, testified that she was supervised by Hogan, the new shipping department foreman. In addition, Phoenix described Hogan as a supervisor in her job performance evaluations. The district court thus found that "Hogan performed all of the duties of Wilson's former position, including supervisory duties." J.A. 819.

Sixth, the district court rejected the company's assertion that an independent basis for Wilson's discharge arose on August 2, 2002, his final day of work and the day after he had been notified of his termination. Phoenix claims that Wilson ordered ten years' worth of packing supplies on his last day of work. The district court found that Wilson had been set up. According to the court, "it appears that someone wrote over [Wilson's] notes after the fact to make it appear that he had intentionally ordered more supplies th[a]n necessary. . . . Instead, he simply ordered supplies that he felt the company would need over the next several months to help [Phoenix] with the transition period after his departure." J.A. 821.

At trial Phoenix offered a reason for Wilson's termination that had not been argued to the EEOC. Hurst testified that Wilson was in

effect replaced by the new computer system. The court found that the different reasons Phoenix gave for Wilson's discharge were a pretext for discrimination. According to the district court, the company executed "a plan to hire a new shipping clerk" (Nix was in fact hired), "then to fire [Wilson] due to his [perceived] disability, and finally to re-name his position as a shipping foreman and to promote Ms. Hogan to shipping foreman with the same duties that [Wilson] had as shipping supervisor." J.A. 829.

The district court ultimately determined that Phoenix regarded Wilson as disabled, failed to accommodate his perceived disability as required by the ADA, and terminated him because of his perceived disability in violation of the ADA. The court awarded Wilson $177,783 in back pay from August 2002 through August 2005, when Wilson became competitively unemployable due to his Parkinson's disease. After finding that Wilson proved "specific harm to his emotional state," J.A. 838, including depression and humiliation, as a result of Phoenix's conduct, the court awarded him $10,000 in compensatory damages. The court also awarded Wilson $10,000 in punitive damages based on its finding that Phoenix's discriminatory plan to terminate Wilson was developed and carried out "with reckless indifference" to Wilson's federally protected rights under the ADA.[1] J.A. 838.

Phoenix appeals, arguing that the district court erred (1) in finding that the company regarded Wilson as being disabled because the company did not have a mistaken perception that Wilson's impairment was greater than it actually was; (2) in finding that the company's stated reasons for terminating Wilson were pretext; and (3) in concluding that Wilson was entitled to reasonable accommodation under the ADA. Wilson cross-appeals, arguing that the district court erred in failing to award him front pay. We review the district court's findings of fact for clear error, Fed. R. Civ. P. 52(a), and its legal conclu-

---

[1]The district court also tried the claims Wilson asserted under the Employee Retirement Income Security Act, *see* 29 U.S.C. § 1001 *et seq.*, and the Age Discrimination in Employment Act, *see* 29 U.S.C. § 621 *et seq.*, and found that Wilson did not satisfy his burden of proof on those claims.

sions de novo, *Roanoke Cement Company v. Falk Corporation*, 413 F.3d 431, 433 (4th Cir. 2005).

## II.

### A.

The ADA prohibits a covered employer such as Phoenix from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to" matters that include "the hiring, advancement or discharge of employees." 42 U.S.C. § 12112(a). A "disability" is defined as:

> (A)   a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

> (B)   a record of such an impairment; or

> (C)   being regarded as having such an impairment.

*Id.* § 12102(2). Subsection (C), which is relevant here, provides that having a disability includes "being regarded as having," § 12102(2)(C), "a physical or mental impairment that substantially limits one or more of the major life activities," § 12102(2)(A). Subsection (C)'s "regarded as" coverage includes the circumstance when the employer "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). The employer, in other words, must entertain a misperception: "it must believe . . . that [an individual] has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Id.* "Major life activities" refers "to those activities that are of central importance to daily life," including walking, seeing, hearing, and manual tasks that are "central to daily life." *Toyota Mtr. Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). Finally, when an employee asserts a subsection (C) claim that he was regarded as disabled, the analysis "focuses on the reactions and perceptions of the [employer's] decisionmakers" who worked with the employee. *Runnebaum v. NationsBank of Md., N.A.*, 123

F.3d 156, 172-73 (4th Cir. 1997), *abrogated on other grounds by Bragdon v. Abbott*, 524 U.S. 624 (1998).

Phoenix contends that the record does not support the district court's ultimate finding that the company regarded Wilson as having an impairment that substantially limits a major life activity. We disagree because the district court made specific findings, which are not clearly erroneous, to support its ultimate finding that Phoenix regarded Wilson as having a disability.

First, the district court found that company president Hurst's statement in his June 2, 2001, e-mail to an assistant was evidence that Phoenix believed that Wilson was disabled. Hurst said pointblank that Wilson "qualifies for ADA designation." J.A. 827. Phoenix argues that this statement should be discounted because it was made before Wilson's medication was adjusted, and it did not reflect what the company believed about Wilson's condition at the time he was terminated. The district court, however, cited Hurst's e-mail as an early example of Phoenix's erroneous perception that Wilson was disabled, a perception that continued, as the court found, until his termination in August 2002.

Second, the district court found that Phoenix's disability perception was evident when it ignored the May 24, 2001, opinion of Dr. Bergmann, the neurologist, who released Wilson to return to work without restrictions "and instead relied on the opinion of the company doctor who had not [re]examined" Wilson. J.A. 827. In other words, the company's firm perception that Wilson was disabled led it to discount the specialist's medical opinion that Wilson was capable of returning to work.

Third, the district court credited Wilson's testimony that Phoenix's senior management treated him "like [he] was a handicapped person" after his panic attack. J.A. 454. This testimony was accepted because Hurst and Wise avoided Wilson whenever possible, and Wise even refused to look at him. This treatment, the court noted, "shows [that] the very myths and fears about disability and disease" can result in a person being regarded as having a disability, one problem "Congress was trying to address with the ADA." J.A. 827.

Ultimately, the district court found that "company officials believed that Wilson was substantially limited in the major life activit[ies] of performing manual tasks" and seeing. J.A. 827. This determination was supported by findings that Phoenix believed that Wilson (1) "was unable to adequately key information into a computer, write, and count washers" and (2) could not "adequately utiliz[e] the information on the computer screen." J.A. 827. Phoenix argues that it "had the correct perception of Wilson's limitations" (some difficulty with performing manual tasks and seeing), and "those limitations did not qualify him as being actually disabled." Appellant's Br. at 22. Therefore, the company says, "it could not have 'regarded' him as being disabled." *Id.* The record, however, supports the district court's finding that Phoenix perceived Wilson to be substantially limited in his ability to see and perform manual tasks. In other words, Phoenix regarded Wilson as disabled.

The court's determination that the company believed that Wilson could not effectively operate, or see well enough to make use of, a computer is supported by more specific findings: the company instructed Wilson not to perform tasks on the computer, such as the input of information, for fear of entry error; and the company did not make the effort to give Wilson adequate training on the new computer system. The district court found that the company believed Wilson could not write, and this finding is supported by the testimony of the human resources assistant who testified that she "couldn't really read" Wilson's handwriting. J.A. 602. Finally, the court found that Phoenix believed that Wilson could not count washers (the company's product), and this finding is supported by the testimony of Wise, who instructed Wilson "not to do counting tasks," J.A. 259, again because the company was afraid he would make errors.

These perceptions on Phoenix's part about the extent of Wilson's impairment were inaccurate. The company, in other words, believed that Wilson's Parkinson's symptoms were substantially more limiting than they actually were, as indicated in further findings by the district court and the record. After crediting Dr. Bergmann's report that Wilson's "disease was 'motor-wise in fairly good control' and that [he] had 'good control of his stiffness and tremor,'" J.A. 816, the district court found that Wilson's "symptoms were fairly well controlled by medication" at the time of his discharge, J.A. 826. Although the court

recognized that Wilson "was beginning to have difficulty with his handwriting and other fine motor functions and with reading the computer screen," he was "still able to" work and "perform the essential functions of his supervisory job." J.A. 828. Indeed, the court noted that Phoenix admitted to the EEOC that Wilson's "Parkinson's disease did not impact his ability to do his job." J.A. 819. The district court found that Wilson "was credible," J.A. 823, and Wilson testified that he was still able to key data into the computer, albeit at a slower pace. Yet, as the district court found, the company refused to give him adequate training on the new computer system. Hurst admitted, however, "that Wilson tried to master the system, and that many other employees also had problems learning the new system." J.A. 815. Wilson's handwriting was still legible at the time of his discharge, as several trial exhibits confirm. And Wilson also testified that he could still count washers when he was discharged, although he would put the small, thin ones aside for a shipping clerk to count. Finally, with respect to general activities in his daily life, Wilson was able to play golf, coach youth sports, and drive at the time of his termination.

Two of the tasks Phoenix mistakenly believed Wilson could not do at work — use a computer effectively and write — transcend the work setting and qualify as activities that are of "central importance to people's daily lives." *Toyota*, 534 U.S. at 202. Likewise, the company's mistaken belief that Wilson could not count washers supports the district court's finding that "Wilson was perceived by Phoenix as unable to perform a variety of tasks central to most people's daily lives." J.A. 827; *see Toyota*, 534 U.S. at 202. Moreover, as the district court found, after Wilson's Parkinson's symptoms flared up in May 2001, the company described him as disabled under the ADA, ignored a specialist's positive assessment of his ability to function, shunned him, and concocted a plan to eliminate his position and get rid of him. These factors, taken together, support the district court's ultimate finding that Phoenix regarded Wilson as having an impairment that substantially limited him in the major life activities of performing manual tasks and seeing.[2]

---

[2]The dissent contends that the district court could not have concluded that Phoenix regarded Wilson as being disabled because the company had no misperception about his condition. As we have demonstrated

B.

Phoenix next argues that the district court erred in finding that the reasons given by the company for discharging Wilson were a pretext for discrimination. The district court analyzed the evidence under the *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In the final steps of this analysis, the trier of fact's "rejection [or disbelief] of the [employer's] proffered reasons [for its actions] will *permit* the trier . . . to infer the ultimate fact of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-49 (2000).

The district court's disbelief of Phoenix's proffered reasons for Wilson's termination was based in part on the court's determination

above, Phoenix's misperceptions are abundantly clear from the district court's findings and the underlying record. On the one hand, the district court found that Wilson had some limitations: he was beginning to have difficulty with his handwriting and other fine motor functions and with reading a computer screen. Wilson typed data into the computer at a slower pace and set aside the small, thin washers for others to count. The district court found, however, that Wilson's "impairment[s] did not substantially limit any major life activities." J.A. 826. On the other hand, the district court made factual findings establishing that Phoenix's perceptions of Wilson's limitations were exaggerated. The court found that Phoenix erroneously perceived Wilson to be substantially limited in the major life activities of performing manual tasks and seeing. Accordingly, the court found that Phoenix believed (1) that Wilson could not perform the manual tasks of writing, counting washers, or keying information into a computer, and (2) that he could not see well enough to make use of information on a computer screen. The district court further found, among other things, that Phoenix characterized Wilson as disabled for ADA purposes, failed to provide him training on the company's new computer system, and instructed him not to enter information on the computer, all findings that support the determination that Phoenix perceived Wilson to be disabled. In sum, the district court's findings satisfied the applicable standard for disability under 42 U.S.C. § 12102(2)(C): the findings established that Phoenix perceived Wilson as having "substantially limiting impairment[s] when, in fact, the impairment[s were] not so limiting." *Sutton*, 527 U.S. at 489.

that the reasons the company gave to the EEOC were different than the one advanced at trial. The company claimed for the first time at trial that the new computer system had "replaced Wilson's job functions," J.A. 830, thereby prompting the company to terminate him. The court found that all of "the reasons given by Phoenix were merely a pretext for discrimination." *Id.* According to the court, Phoenix concocted and executed a scheme to hire a new shipping clerk (Nix), fire Wilson because of his perceived disability while pretending to undergo a reduction in force, and promote Hogan to the newly-created position of shipping foreman with the same duties that Wilson had performed as shipping supervisor. The court's more detailed findings about the company's false (or pretextual) reasons for terminating Wilson are set forth in part I, *supra* at 5-7, and are amply supported by the evidence.

C.

Phoenix also challenges the district court's determination that the company failed to make reasonable accommodations for Wilson's perceived limitations when it refused to provide him with a larger computer screen and assistance with writing. *See* 42 U.S.C. § 12112(b)(5)(A) (describing the requirement for reasonable accommodations). As a threshold matter, Phoenix argues that an employer does not have a duty to provide accommodation to an employee it simply regards as disabled. There is a pronounced circuit split on this issue. *Compare Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1232-33 (9th Cir. 2003) (concluding that there is no duty to accommodate an individual who is regarded as having a disability); *Weber v. Strippet, Inc.*, 186 F.3d 907, 916-17 (8th Cir. 1999) (same); *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999) (reaching same conclusion without analysis); *Newberry v. E. Tex. State Univ.*, 161 F.3d 276, 280 (5th Cir. 1998) (same); *with D'Angelo v. Conagra Foods, Inc.*, 422 F.3d 1220, 1240 (11th Cir. 2005) (concluding that there is a duty to accommodate an individual who is regarded as having a disability); *Kelly v. Metallics West, Inc.*, 410 F.3d 670, 675 (10th Cir. 2005) (same); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 772-76 (3d Cir. 2004) (same); *Katz v. City Metal Co.*, 87 F.3d 26, 33 (1st Cir. 1996) (same). We are not required to choose a side on this issue because the damages awarded to Wilson are tied

directly to his discriminatory termination and not to Phoenix's failure to accommodate.

## III.

Wilson cross-appeals, contending that the district court erred when it determined that he was not entitled to an award of front pay. Front pay is money awarded for the loss of employment after the date of judgment. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). Whether front pay is to be awarded is a matter left to the discretion of the trial judge. *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991). Based on the uncontradicted testimony of Wilson's witness, Dr. Bergmann, the district court found that Wilson was competitively unemployable by the end of 2005, which was six months before the entry of judgment. Accordingly, the court did not abuse its discretion in denying Wilson an award of front wages.

## IV.

The judgment of the district court is affirmed.

*AFFIRMED*

NIEMEYER, Circuit Judge, dissenting:

James Wilson's employment with Phoenix Specialty Manufacturing Company, a manufacturer of specialty washers, was terminated August 1, 2002. Phoenix Specialty contended that it was eliminating Wilson's position as part of a reduction-in-force in response to financial difficulties. It claimed that Wilson was selected as part of the reduction-in-force because he was unable to do efficiently some of the tasks that were required in its shipping department; he made "many errors with tasks"; and he failed to master the new computer system that had been installed months earlier.

Wilson contended, however, that his employment was terminated because of his Parkinson's disease, which had been diagnosed in 1998, and the health insurance costs required to treat that disease. He alleged that he had an impairment but was able to perform his job

"with slight accommodation" and did so as expected by Phoenix Specialty.

At trial Wilson testified that he needed help in performing several of the tasks assigned to him. He stated that he asked for a 21-inch screen for his computer to mitigate his reduced ability to see, but he was given a 17-inch screen. He stated he needed help with his handwriting:

> My handwriting was bad. You couldn't read what I was writing. And I would ask for help in handwriting, and I was told that I could not use — I was using Marviette Hogan, because she was in the shipping department. I was told I could not use her by Mr. Wise and Marviette because it was not her job to do that.

He stated that he was told not to "mess with the Pitney-Bowes shipping machine and key in inventory," because he made too many errors inputting the machine. As he acknowledged, "I could not do it as fast because of the slowness effect of the Parkinson's disease on the right side. And I asked for help." He testified that he was "slow in typing because of Parkinson's disease." He indicated that he had "trouble writing for a long time; and the evaluations [of employees] were due to be in, and I asked [Crystal Baxley, the company's human resources assistant] if she would help me write the evaluations." In preparing the company's specialty washers for shipping, he stated that he could not perform the count that was necessary: "I counted the big items, the bulky items. And the small items that were so thin, I would shake so bad that I didn't have the dexterity to handle them, so I would set them aside when I was helping on the assembly line for other shipping clerks to count."

To show that his firing was a pretext for discrimination based on his disability, Wilson put in evidence that Phoenix Specialty knew fully of his condition and monitored every detail, going so far as to track his doctor visits and medical bills. He testified that Phoenix Specialty "required" him "to report to management . . . what the doctor told [him]." In addition, the company was aware of the nature and scope of the particular effects of his impairment in that it was involved in addressing them. The company provided him with a 17-

inch computer screen, assisted him in writing reports, and circum-scribed some of his tasks, prohibiting him, for instance, from keypunching inventory into the computer system because of his lack of dexterity. The record amply demonstrates that during the period when Phoenix Specialty was considering its reduction-in-force, it knew the full extent of Wilson's ability and disability.

Following a bench trial, the district court found as facts the follow-ing:

> At all times through the date of Wilson's termination, not-withstanding his Parkinson's disease, the Plaintiff was able to perform the essential functions of his job with minimal accommodations. In fact, the defendant states in its position statement to the EEOC that the plaintiff's Parkinson's Dis-ease did not impact his ability to do his job. Plaintiff merely needed some help with writing and he needed a larger com-puter screen. Although the plaintiff requested a twenty-one inch screen he was given only a seventeen inch screen, the size that other supervisors were given. Plaintiff also asked for assistance with handwriting. He had instructed an employee in his department, Marviette Hogan, to help him write evaluations. Robert Hurst and Harry Wise told Plain-tiff he could not use Hogan to write for him. Wilson finally requested assistance from Defendant's Human Resources Assistant, Crystal Baxley, to help write the evaluations. Both Baxley and Hurst knew that Wilson was having prob-lems writing and that these problems were related to his Par-kinson's disease. The defendant presented no evidence that these accommodations would have constituted an undue hardship. At the time of his discharge in 2002, his medical evidence indicates that Wilson's condition was stabilized by medication. In addition, as shown by plaintiff's exhibit 7, the handwritten notes by Wilson regarding supplies which should be ordered, written on August 2, 2002, the plaintiff was still able to write at that time, although apparently with some difficulty. He could also play golf, coach youth sports and drive.

But the district court concluded as a matter of law that the plaintiff was not disabled as that term is defined in the Americans with Dis-

abilities Act ("ADA"), 42 U.S.C. § 12102(2)(A) (defining "disability" as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual"):

> The Court finds that the plaintiff has not proved that, as of August 1, 2002 (the date of discharge), [Wilson] satisfied the requirements of 42 U.S.C. § 12102(2)(A). Based upon the testimony of Dr. Bergmann, the plaintiff was still able to work on the date of discharge, and his symptoms were fairly well controlled by medication. Therefore, his impairment did not substantially limit any major life activities at that time.

Necessarily, therefore, the facts to which Wilson testified — and as found by the district court — about his ability to do his job constituted an "impairment," but not one constituting a "disability." Relying on the same facts found, however, the district court concluded, as a matter of law, that "Phoenix *regarded* him as having" a disability under 42 U.S.C. § 12102(2)(C). To support this ruling, the district court stated:

> [T]he testimony revealed that the company officials believed that Wilson was substantially limited in the major life activity of performing manual tasks. This was shown by their belief that he was unable to adequately key information into a computer, write, and count washers. The Court finds that Wilson was perceived by Phoenix as unable to perform a variety of manual tasks central to most people's daily lives. Further, the evidence at trial revealed that the company officials believed that Wilson was substantially limited in the major life activity of seeing. This was shown by their belief that he had difficulty in adequately utilizing the information on the computer screen.

The district court thus concluded that Phoenix Specialty regarded Wilson as being disabled because of its belief that (1) Wilson was unable to key information into a computer adequately; (2) he was unable to write adequately; (3) he was unable to count washers; and (4) he had difficulty seeing the information on his computer screen. Each of these four beliefs attributed to Phoenix Specialty were, how-

ever, accurate ones, and their accuracy was demonstrated by the direct testimony of Wilson at trial and the district court's findings of fact.

The impairments that were imputed to Phoenix Specialty's belief were also incontrovertibly matters with which Phoenix Specialty was fully familiar. It knew of Wilson's difficulty in seeing because Wilson asked Phoenix Specialty for a 21-inch computer screen, and Phoenix Specialty gave him a 17-inch screen. Wilson asked for help with respect to writing and typing, and Phoenix Specialty employees provided him assistance in varying degrees. And, as for the uncounted washers, Wilson left them for the other Phoenix Specialty employees to count and ship. All of these situations were discussed with management. In addition, management had the benefit of monitoring the medical reports of doctors who were treating Wilson and of Wilson's debriefings of his treatment.

The analytical difficulty in which Wilson finds himself now is that he prosecuted his case as one in which his termination was based on a disability that involved substantial limitations with respect to major life activities, as defined in 42 U.S.C. § 12102(2)(A). After the district court rejected that position, finding that he did not prove actual limitations of major life activities, he is left to argue the opposite position, that he was not so disabled but Phoenix Specialty *regarded* him as so disabled. The viability of such a position, however, tends to collapse in the switch, because: (1) Wilson did not suffer limitations of major life activities; (2) Phoenix Specialty fully understood the limitations he was suffering at the time he was terminated and thus could not have misperceived them; and (3) there was no evidence or finding that Phoenix Specialty *incorrectly believed* that Wilson was substantially limited as to major life activities. I address these three points in order to show how they defeat his claim as a matter of law.

I

There is no question now that Wilson did not suffer limitations of major life activities, as required to show a disability under 42 U.S.C. § 12102(2)(A). The district court found that Wilson was *not* disabled in this manner, finding that at the time of his termination, "his impairment did not substantially limit *any* major life activities." (Emphasis added). And, Wilson does not appeal this holding. Accordingly, we

begin the analysis with the fact that while Wilson suffered from Parkinson's disease, which caused him difficulties in performing his job tasks, none of the limitations found by the district court amounted to limitations of major life activities. Thus, Wilson is left with the claim that Phoenix Specialty "regarded" his impairment to limit major life activities, as "disability" is defined in § 12102 (2)(C).

## II

Because Wilson did not have an impairment that substantially limited one or more of his major life activities, he must now rely on the district court's conclusion that Phoenix Specialty believed that he did have such an impairment and acted on that belief.

The ADA prohibits an employer from discriminating against an employee on the basis that the employer "regarded" the employee as having an "impairment that substantially limits one or more of [his] major life activities." 42 U.S.C. §§ 12102(2)(C), 12112(a). To establish such a "regarded as" claim, a plaintiff must show that the employer was *mistaken* in its belief that its employee was suffering a substantial limitation of one or more of his major life activities. As the Supreme Court has explained:

> There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity *mistakenly believes* that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity *mistakenly believes* that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual — it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999) (emphasis added). Thus, as relevant to this case where Wilson did not suffer an impairment substantially limiting a major life activity, Wilson must demonstrate that Phoenix Specialty *mistakenly believed* that he did

suffer an impairment that substantially limited a major life activity. It is not sufficient for him to show that Phoenix Specialty had a mistaken belief about whether he was "unable to perform the tasks associated with [his] specific job." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 200-01 (2002).

Wilson made no such showing. Indeed, he undertook to prove at trial (1) that he in fact had an impairment substantially limiting a major life activity and (2) that Phoenix Specialty *was fully aware* of the impairment. He undertook to prove that Phoenix Specialty was fully aware of his condition to satisfy the requirement that the reasons given by Phoenix Specialty for his discharge were a pretext. Yet while the district court concluded that Wilson failed to prove the requisite nature of his impairment, it agreed with Wilson that Phoenix Specialty knew of the nature of his impairment, finding that Phoenix Specialty's reasons for termination were a pretext. It now becomes nearly impossible for Wilson to claim that even though Phoenix Specialty was fully aware of his impairment, it was *mistaken* in its belief that he was impaired.

The district court's conclusions do not help Wilson. It found that Phoenix Specialty *believed* that Wilson "was unable to adequately key information into a computer, write, and count washers" and could not "adequately utiliz[e] the information on the computer screen." It relied on *no other beliefs* held by Phoenix Specialty. Yet these identified beliefs on which the district court relied were not *mis*beliefs or *mis*perceptions, as required to establish liability under the Act. To the contrary, they were accurate beliefs.

First, Wilson testified fully to actually having the impairments described by the district court. Wilson testified that in order to key functions into the computer, he needed a larger computer screen; he stated that his handwriting was "bad" and one "couldn't read what [he] was writing"; he said that he could not key inventory information into the computer system "as fast because of the slowness effect of the Parkinson's disease on the right side," prompting him to ask for help; he testified that he was "slow in typing because of Parkinson's disease"; he said that he had "trouble writing for a long time" and that he needed help to write evaluations of subordinates; he said that he could not count small washers because he "would shake so bad that

[he] didn't have the dexterity to handle them." Each of Phoenix Specialty's beliefs found by the district court with respect to these matters was in fact accurate.

Moreover, the evidence showed that Phoenix Specialty knew fully and accurately about each of the impairments testified to by Wilson and found by the district court. With respect to seeing the computer, Wilson informed Phoenix Specialty about his impairment, and Phoenix Specialty provided him with a larger computer screen, albeit not the 21-inch screen requested. In connection with his writing inadequacies, Wilson requested other employees of Phoenix Specialty to help him, namely Marviette Hogan, a subordinate employee, and Crystal Baxley, the human resources assistant. As the district court found, "Both Baxley and Hurst [the chief operating officer of Phoenix Specialty] knew that Wilson was having problems writing and that these problems were related to his Parkinson's disease." Finally, with respect to the inability to count washers, Wilson stated that he set aside the washers that he could not count for other people in the company to count. In addition, Wilson himself testified to seeking help from company employees and to discussing his impairments with "management." He stated affirmatively that other than the impairments to which he testified, he did not discuss any other problems with management.

In addition to the knowledge held by Phoenix Specialty about Wilson's specific impairments, the record showed that Phoenix Specialty monitored Wilson's medical condition, reviewing doctors reports and receiving debriefings from Wilson himself after each doctor's visit.

There is simply no evidence from which to conclude that Phoenix Specialty had a *misperception* about Wilson's impairments at the time it terminated his employment, nor did the district court find any. To the contrary, the district court seemed to assume that if Phoenix Specialty believed that Wilson had the impairments that the court identified and if Phoenix Specialty acted on those beliefs, it violated the ADA without the need for finding a *mis*belief. As the district court stated:

> [T]he testimony revealed that the *company officials believed* that Wilson was substantially limited in the major life activ-

ity of performing manual tasks. *This was shown by their belief that he was unable to adequately key information into a computer, write, and count washers.* The Court finds that Wilson was perceived by Phoenix as unable to perform a variety of manual tasks central to most people's daily lives. Further, the evidence at trial revealed that the *company officials believed* that Wilson was substantially limited in the major life activity of seeing. *This was shown by their belief that he had difficulty in adequately utilizing the information on the computer screen.*

(Emphasis added). Thus, the court relied on Phoenix Specialty's belief of the very impairments to which Wilson testified and about which Phoenix Specialty had complete knowledge. What the court failed to recognize, however, was that it had to find that Phoenix Specialty *misperceived* Wilson's condition. In the absence of a misperception, the district court could not have concluded that Phoenix Specialty "regarded" him as being disabled. *See Sutton*, 527 U.S. at 489.

To support his "regarded as" claim on appeal, Wilson relies heavily on an incident that occurred more than a year before his discharge to argue that Phoenix Specialty had a misconception about his disability. While the incident is hardly relevant to what occurred more than a year later when Wilson was discharged, there are numerous additional reasons why the incident was an insufficient basis on which Wilson could rely to support his case.

In May 2001, Wilson suffered a panic attack while at work, after which he spent the next few weeks on a fully paid medical leave of absence. During his leave, he saw both his local doctor, who also happened to be Phoenix Specialty's company doctor, and a specialist in Charleston, South Carolina. Although the specialist cleared Wilson to return to work with no restrictions, Phoenix Specialty instructed Wilson to get clearance from the local doctor before it would permit him to work. While Wilson never actually saw the local doctor again during this time frame, he did return to full time work in late June 2001. During Wilson's absence from work, the president of Phoenix Specialty wrote an email message stating that Wilson "qualifie[d] for ADA designation." Wilson relies upon this fragmentary statement to

argue that Phoenix Specialty mistakenly regarded him as disabled under the ADA.

This limited evidence, however, is taken out of context and fails to take into account that the same person observed, after Wilson's return to work, that Wilson "returned to his former self," "was a lot stronger," "was alert," and "was back to the [Wilson] who had been with us previously." Moreover, it fails to recognize that the statement was neither unreasonable nor inaccurate. In the weeks following Wilson's debilitating panic attack that rendered him physically unable to work, it was simply good management to note that Wilson qualified for ADA designation, implying that the company should act appropriately. Given Wilson's Parkinson's disease, the email was accurate inasmuch as Parkinson's disease is an impairment that can enable a person to be a "qualified individual with a disability" under the ADA. But to say that Wilson "qualifies for ADA designation" says nothing that supports the notion that Phoenix regarded Wilson as actually "disabled," as that term is used in the ADA.

## III

Finally, the district court erred in concluding that Phoenix Specialty's belief about Wilson's identified impairments amounted to a belief that Wilson was substantially limited in "one or more of his major life activities."

The district court properly held that none of Wilson's identified impairments substantially limited a major life activity. Yet, to support its "regarded-as-disabled" conclusion, the district court recharacterized Phoenix Specialty's belief about those very same impairments as a belief that Wilson was substantially limited in a major life activity. This was obviously a flawed analysis or a misperception of the law. The district court could not properly find the specific impairments identified by Wilson not to substantially limit any major life activities and at the same time say that because Phoenix Specialty believed that Wilson had these impairments, they became beliefs about substantial limitations of major life activities.

As both *Toyota* and *Sutton* make clear, it is not enough simply for an employer to have a mistaken perception of an employee's impair-

ments with respect to his specific job. *See Toyota*, 534 U.S. at 200-01; *Sutton*, 527 U.S. at 489-91. Rather, an employer must incorrectly believe that an employee's impairments substantially limit major life activities. *See* 42 U.S.C. § 11202(2); *Toyota*, 534 U.S. at 196-202. Thus, the district court's factual findings with respect to Phoenix Specialty's belief regarding Wilson's ability to perform tasks associated with his specific job failed to establish that Phoenix Specialty mistakenly regarded Wilson as limited in performing major life activities.

There can be no doubt that Phoenix Specialty had concerns about Wilson's ability to perform specific tasks on his job. But its concerns were with the very impairments that the court found did *not* substantially limit major life activities; they related merely to difficulties in job performance. Concerns about job performance, however, do not support the legal conclusion that Phoenix Specialty believed Wilson to be "substantially limited" in any "major life activities." As the Supreme Court stated in *Toyota*, "[T]he manual tasks unique to any particular job are not necessarily important parts of most people's lives. As a result, occupation-specific tasks may have only limited relevance to the manual task inquiry." *Id.* at 201. Absent any showing of a misperception by Phoenix Specialty that Wilson was substantially limited in a major life activity, the company was "free to decide that some limiting, but not *substantially* limiting, impairments make individuals less than ideally suited for a job" without running afoul of the ADA. *Sutton*, 527 U.S. at 490-91.

IV

Because Wilson was not an individual with a disability, as defined by the ADA, it is not necessary to consider Phoenix Specialty's challenge to the district court's finding that Phoenix Specialty's stated reasons for firing Wilson were a pretext for discrimination. Wilson was neither actually disabled nor regarded by Phoenix Specialty as being disabled, so Phoenix was free to discharge him as an at-will employee for any of the reasons Phoenix provided, or even because it thought that Wilson's non-substantially limiting Parkinson's disease made him "less than ideally suited for [his] job." *Sutton*, 527 U.S. at 491.

For these reasons, I would reverse the judgment of the district court. In addition, I take the dissenter's privilege to observe that in

affirming the district court, the majority failed to interpret the ADA "strictly to create a demanding standard for qualifying as disabled," as instructed by the Supreme Court. *See Toyota*, 534 U.S. at 197.