**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BENJAMIN REYNOLDS,

>*Plaintiff-Appellant,*

v.

AMERICAN NATIONAL RED CROSS;
AMERICAN RED CROSS GREENBRIER
VALLEY CHAPTER; WALTER M.
LOCKHART,

>*Defendants-Appellees,*

and

No. 11-2278

AMERICAN RED CROSS NATIONAL
HEADQUARTERS, Washington, DC;
AMERICAN RED CROSS MID-
ATLANTIC SERVICE AREA, Raleigh,
NC; NIKKI MCBAIN, Chapter
Solutions Manager, Raleigh, NC,

>*Defendants.*

BENJAMIN REYNOLDS,

                    *Plaintiff-Appellee,*

             v.

AMERICAN NATIONAL RED CROSS;
AMERICAN RED CROSS GREENBRIER
VALLEY CHAPTER; WALTER M.
LOCKHART,

                    *Defendants-Appellants,*               No. 11-2280

             and

AMERICAN RED CROSS NATIONAL
HEADQUARTERS, Washington, DC;
AMERICAN RED CROSS MID-
ATLANTIC SERVICE AREA, Raleigh,
NC; NIKKI MCBAIN, Chapter
Solutions Manager, Raleigh, NC,

                    *Defendants.*

Appeals from the United States District Court
for the Southern District of West Virginia, at Beckley.
Irene C. Berger, District Judge.
(5:10-cv-00443)

Argued: October 4, 2012

Decided: December 7, 2012

Before KING, KEENAN, and THACKER, Circuit Judges.

No. 11-2278 affirmed in part and vacated in part; No. 11-2280
dismissed by published opinion. Judge Thacker wrote the
opinion, in which Judge King and Judge Keenan joined.

**COUNSEL**

Sean Willard Cook, MEYER FORD GLASSER & RAD-MAN, PLLC, Charleston, West Virginia, for Appellant/Cross-Appellee. Constantinos George Panagopoulos, BALLARD SPAHR, LLP, Washington, D.C., for Appellees/Cross-Appellants.

---

**OPINION**

THACKER, Circuit Judge:

Benjamin S. Reynolds ("Appellant") appeals the district court's award of summary judgment in favor of the American National Red Cross and the American Red Cross Greenbrier Valley Chapter (collectively, "Appellees"). The district court held that Reynolds failed to submit sufficient evidence to meet his burden with regard to various Americans with Disabilities Act ("ADA") claims. Despite their victory below, Appellees nonetheless cross-appeal on the ancillary issue of whether the number of employees of the National Red Cross and the Greenbrier Valley Chapter can be aggregated for purposes of determining "employer" status under the ADA. For the reasons that follow, we affirm the district court's award of summary judgment to Appellees, vacate the district court's ruling that the Greenbrier Valley Chapter is an "employer" under the ADA, and dismiss the cross-appeal.

I.

A.

Reynolds worked for the Greenbrier Valley Chapter of the American Red Cross in Lewisburg, West Virginia (the "Chapter"). He began as a volunteer in 1994 and then worked as a per diem instructor beginning in 2004, being paid for each

health/safety, first aid, and CPR class he taught. He eventually became a part-time employee in 2005. For the entire time he was with the Chapter, Reynolds worked directly for Walter M. Lockhart, Executive Director.[1] Reynolds and Lockhart met some years previously when they both volunteered with the Civil Air Patrol. They interacted socially "every few days," J.A. 509,[2] and Lockhart loaned Reynolds around $6,000 over the course of their friendship.

In 2006, Lockhart offered Reynolds a full-time job with the chapter as a "Manager of Service Delivery," a job description that Lockhart drafted himself, and Reynolds accepted. Reynolds began work in that position on or about August 1, 2006. The job description provided, "[j]ob is physically comfortable; individual has discretion about walking, standing, etc." J.A. 114.31. It also required Reynolds to "[t]each[ ] training courses as necessary" and "recruit[ ] and retain[ ] volunteer instructors for community classes and mission related courses." *Id.* at 114.28, 114.30. The parties agree "90% of [Reynolds's] job was to teach health and safety classes. However, [he] was also tasked with recruiting or soliciting training classes from the community." *Id.* at 763. The salary was listed at $23,600.00 annually with no benefits.[3]

---

[1]Reynolds sued Lockhart as well, but Lockhart was dismissed by a previous order of the district court. *See Reynolds v. Am. Nat'l Red Cross*, No. 5:10-cv-00443, 2011 WL 4479054 (S.D. W. Va. Sept. 26, 2011). Reynolds is not appealing that order.

[2]Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[3]There was some discussion amongst Reynolds and the Chapter regarding an employment requirement that Reynolds solicit enough training classes to be able to cover his salary. There is a dispute, however, as to whether this requirement was, in fact, implemented, and, if so, the period of time in which Reynolds would have had to meet the requirement. Reynolds claims, "my understanding was that if that [the requirement] was implemented, that I had a year from the date that I started that job to accomplish that." J.A. at 496. Instead, Reynolds was terminated after only six months of full time employment.

On or about August 5 or 6, 2006, during the first week that Reynolds worked as Manager of Service Delivery, Lockhart instructed Reynolds to help move a baby grand piano from the home of a donor to Lockhart's personal residence. Lockhart and Robert Clark, a member of the Chapter's Executive Committee, also helped. Reynolds alleges that he experienced "severe pain in both his neck and upper back" when he started moving the piano. Am. Compl. ¶ 14.[4] Clark testified, "when we got into the process of moving the piano [Reynolds said,] 'boy, my back really hurts'. So we say, 'then don't touch the piano'." J.A. 703. Clark said he "strongly advised [Reynolds] not to help." *Id.* Reynolds alleges, however, that Lockhart "ignored [his] plea [to stop moving the piano] and required him to continue assisting in delivering and unloading the piano to his personal residence." Am. Compl. ¶ 15. Reynolds admitted that prior to this incident, his back was "stiff and sore because he had previously moved mattresses for the Chapter." J.A. 763.

Reynolds alleges that after the piano incident he went to the emergency room "a few days later . . . to seek relief from the persistent and severe pain in his neck and upper back." Am. Compl. ¶ 16.[5] He saw two physicians, Dr. Boisverte and Dr. Kribs, both in Lewisburg, who eventually referred him to Dr. Dilaawar Mistry at the University of Virginia Health System in Charlottesville. Because Reynolds's car had been repossessed and he had no other way to get to the appointment, Lockhart drove Reynolds to Charlottesville to see Dr. Mistry on September 7, 2006.

---

[4]The Amended Complaint is found at J.A. 40-54.

[5]During his deposition Reynolds admitted to going to the emergency room on August 4, 2006, which was *before* the piano moving incident. For the purpose of the Motion for Summary Judgment, however, Appellees assumed that the alleged back injury was due to the piano lifting incident. Therefore, this Court likewise makes that assumption for the purpose of this appeal.

Dr. Mistry examined Reynolds and noted he "complain[ed] of persistent left arm pain." J.A. 116-17. The physical examination showed, however, "[n]ormal range of motion and strength in flexion, extension and axial rotation of the neck. Normal range of motion and strength of both shoulders, elbows and wrists. There was mild sensory loss on the tip of the index finger of the left hand compared to the right." *Id.* at 117. Dr. Mistry also noted, in the "history" portion of the report, that Reynolds's X-ray showed "intervertebral disk space narrowing with osteophytic change most pronounced at C5-C6 and C6-C7" and "some foraminal encroachment secondary to osteophytes bilaterally." *Id.* at 116. Dr. Mistry scheduled an MRI to be performed in Charlottesville, made a follow-up appointment on September 19, 2006, and gave Reynolds a note stating that he could return to work "with restrictions that include lifting weights only up to 15 pounds." *Id.* Dr. Mistry testified that due to Reynolds's

> normal range of motion and strength of his shoulders, elbows and wrists, . . . [and] neck and flexion/extension, axial rotation, and his indication that he needs to return to work for the Red Cross, I felt as a clinician that up to 15 pounds would be reasonable to let him continue his work. . . .

*Id.* at 328.

After the examination, Dr. Mistry said Reynolds had "no physical limitations as far as range of motion" and he "would [not] consider [Reynolds] disabled." J.A. 333. Reynolds never returned to Charlottesville for his follow-up appointment or MRI. Therefore, Dr. Mistry had no occasion to determine if the fifteen-pound lifting restriction that he imposed was still appropriate weeks later.

Reynolds claims that after he returned to work, he was asked to lift things in excess of fifteen pounds, despite Lockhart's knowledge of Dr. Mistry's orders. Upon their return to

Lewisburg, Lockhart "instructed [Reynolds] to assist with moving boxes, mattresses, furniture and a five-drawer file cabinet. [Reynolds] estimated that he lifted items weighing more than fifteen pounds two to three times a week." J.A. 765, 533. Notably, however, Reynolds "never refused Lockhart's instruction to lift any item while he was under the restriction" and "could recall only one conversation when he told Lockhart that he believed that moving a loaded file cabinet would be too heavy for him." *Id.* at 765-66, 540.

After allegedly sustaining the above-described back and neck injuries,[6] Reynolds twice told Lockhart he wanted to file a workers' compensation claim. Reynolds stated that Lockhart told him that if he did so, "[he] would be dismissed and that the Red Cross would fight [the claim]." *Id.* at 488. Lockhart also told him the Chapter's Executive Committee "[isn't] going to let you do that," and a workers' compensation claim "would cost the chapter either one or one-and-a-half percent rate increase hike" and the Chapter "wouldn't stand for that." *Id.* at 490.

## B.

At some point before the end of 2006, the Chapter determined that it no longer had the funds to pay Reynolds, and Reynolds was so advised. Then, on or around January 28, 2007, Lockhart verbally informed Reynolds that he was terminated because the Chapter did not have the funds to pay him. On January 30, 2007, Reynolds received a termination letter from Lockhart stating, "[d]ue to budget restriction [sic] the Board of Director [sic] has asked me to termination [sic] your employment with this chapter as of today." The letter continued,

---

[6]Reynolds also claims that he was disabled because he had "a blood disorder" which led to erectile dysfunction, but offered no medical support in the record for this allegation nor any indication as to how this alleged disorder rendered him disabled. Br. of Appellant 26-27.

We are exercising our rights as an "at will employer." As you know this had been the balance for the last ninety day [sic], hoping you would generate enough income to cover your salary. This has not been done. Also the single family files has [sic] not been entered into the CAS system, since July 2006. Only about fifty percent of the Instructor [sic] in health and safety has been upgraded.

J.A. 120.

As noted, there is some dispute as to whether Reynolds was required to bring in enough money to cover his salary as a part of his employment. It is undisputed that Reynolds did not receive any negative evaluations or reprimands related to his job performance prior to his termination.

C.

After his termination from the Chapter, Reynolds applied for and was denied West Virginia workers' compensation benefits for his alleged back and neck injuries because his application was untimely. He then filed a disability discrimination charge against the Chapter with the Equal Opportunity Employment Commission ("EEOC") based on those alleged injuries. He claimed that he was "harassed, retaliated against, treated differently from others, denied a reasonable accommodation, and unlawfully discharged based on his disability." J.A. 768.

In March 2008, Reynolds obtained a teaching position in North Carolina. He earned $43,000 per year, plus full benefits. While at that job, Reynolds moved 195 books on a book cart down a ramp. He tried to push the cart in front of him, but it was "extremely heavy," so he tried to get in front of the cart. The cart "got away from [him]" and "basically ran [him] over." J.A. 442-43. After that incident, Reynolds filed for worker's compensation benefits, and he has been receiving

those benefits from the state of North Carolina since August 21, 2008.

On December 30, 2009, the EEOC determined that the Chapter was not an ADA covered employer and dismissed Reynolds's EEOC claim. Reynolds then filed this action in district court.

Appellees filed a motion for summary judgment, arguing Reynolds did not present sufficient evidence to prove he was disabled and, in any event, the Chapter was not an "employer" under the ADA. The district court ruled in favor of Appellees as to the former but against Appellees on the latter. It held that, even though the Chapter employed fewer than fifteen people—the threshold number of employees required to invoke the ADA—the Chapter nonetheless was an "agent" of the American National Red Cross, a covered employer under the ADA. *See Reynolds v. Am. Nat'l Red Cross*, No. 5:10-cv-00443 (S.D. W. Va. Oct. 17, 2011), ECF No. 88.[7] Reynolds filed a timely appeal, and Appellees filed a cross-appeal on the agency issue alone.

## II.

We review the district court's summary judgment ruling de novo, applying the same standard applied by the district court. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011); *Med. Waste Assocs. Ltd. v. Mayor & City Council of Baltimore*, 966 F.2d 148, 150 (4th Cir. 1992). Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to summary judgment as a matter of law. *Id.* On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal quotation marks omitted).

---

[7]The district court's opinion is found at J.A. 761-94.

### III.

The ADA provides, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Covered entity" is defined as "an employer, employment agency, labor organization, or joint labor-management committee." *Id.* § 12111(2). "Employer" is defined as "a person engaged in an industry affecting commerce who has 15 or more employees . . . , and any agent of such person[.]" *Id.* § 12111(5)(A).

### A.   The Appeal

Reynolds appeals three ADA claims on which the district court awarded summary judgment: (1) he was fired because of his alleged disability (the "primary ADA claim"); (2) he was retaliated against for engaging in protected activities under the ADA (the "retaliation claim"); and (3) his employer shared confidential medical information about his alleged disability (the "confidentiality claim"). We address each in turn below.

### 1.   The Primary ADA Claim

To survive summary judgment on the primary ADA claim, Reynolds was required to produce evidence sufficient to demonstrate that (1) he "was a qualified individual with a disability"; (2) he "was discharged"; (3) he "was fulfilling h[is] employer's legitimate expectations at the time of discharge"; and (4) "the circumstances of h[is] discharge raise a reasonable inference of unlawful discrimination." *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 273 n.9 (4th Cir. 2004) (internal quotation marks omitted). Evidence of all four of these elements is necessary to survive summary judgment. Reynolds' claim fails at step one.

Reynolds was first required "to produce evidence that [he] is . . . disabled." *Rohan*, 375 F.3d at 272. The ADA defines disability as any one of the following: "(A) a physical or mental impairment that substantially limits one or more . . . major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *see also Rohan*, 375 F.3d at 273. As explained below, because Reynolds does not produce sufficient evidence to satisfy this element of the claim, we need not go further.

a.

Given that Reynolds's alleged disability occurred in 2006, in deciding whether Reynolds produced sufficient evidence of a disability, we must first decide whether to apply retroactively the ADA Amendments Act of 2008 (the "ADAAA"), which took effect January 1, 2009. *See* ADAAA, Pub. L. No. 110-325, § 8; 122 Stat. 3553, 3553 (Sept. 25, 2008).

In passing the ADAAA, Congress was concerned "lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities." 122 Stat. at 3553. Congress believed that over time, ADA case law "eliminate[d] protection for many individuals whom Congress intended to protect." *Id.*

Before the enactment of the ADAAA, courts relied upon *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), and *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), in determining whether a plaintiff was disabled. These cases defined the terms "substantially" and "major," as used in the ADA definition of disability, "to be interpreted strictly to create a demanding standard for qualifying as disabled[.]" *Toyota*, 534 U.S. at 197.

The *Toyota* Court held, in order to qualify as disabled under the ADA, "an individual must have an impairment that

prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." 534 U.S. at 198. The Court continued,

> It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.

*Id.*; *see also Sutton*, 527 U.S. at 482 ("A 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken.").

The district court decided — as have eight circuits—that the ADAAA does not apply retroactively and instead, relied on *Toyota* and *Sutton* in ruling on Reynolds' claim. *See Carter v. Pathfinder Energy Servs.*, 662 F.3d 1134, 1144 (10th Cir. 2011) (declining to impose the ADAAA retroactively); *Nyrop v. Indep. Sch. Dist. No. 11*, 616 F.3d 728, 734 n.4 (8th Cir. 2010) (same); *Becerril v. Pima Cnty. Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009) (same); *Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 35 n.3 (1st Cir. 2009) (same); *Fredricksen v. United Parcel Serv. Co.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009) (same); *Lytes v. D.C. Water & Sewer Auth.*, 572 F.3d 936, 942 (D.C. Cir. 2009) (same); *Millholland v. Sumner Cnty. Bd. of Educ.*, 569 F.3d 562, 565 (6th Cir. 2009) (same); *EEOC v. Agro Distribution LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009) (same).[8]

---

[8]This court has also held the same in an unpublished opinion. *See Cochran v. Holder*, 436 F. App'x 227 (4th Cir. June 21, 2011).

The Supreme Court has held, "[R]etroactivity is not favored in the law[.] [C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 264 (1994). The ADAAA itself provides "[t]his Act and the amendment made by this Act shall become effective on January 1, 2009." 122 Stat. at 3559. In *Cochran*, this court concluded that the amendment "evinces a prospective intent with its delayed effective date." 436 F. App'x at 232. We agree: there is no language in the ADAAA indicating that Congress intended to make this law retroactive; in fact, the indication is to the contrary.

Reynolds nonetheless contends that although the ADAAA was not in effect at the time the conduct giving rise to this case occurred, it was in full effect when the district court rendered its decision below (October 17, 2011), and it should be applied for that reason. *See Landgraf*, 511 U.S. at 273 ("[I]n many situations, a court should apply the law in effect at the time it renders its decision, even though that law was enacted after the events that gave rise to the suit." (internal citations and quotation marks omitted)). But *Landgraf* resolved,

> [P]rospectivity remains the appropriate default rule. Because it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations. Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits. Such a requirement allocates to Congress responsibility for fundamental policy judgments concerning the proper temporal reach of statutes, and has the additional virtue of giving legislators a predictable background rule against which to legislate.

511 U.S. at 272-73; *see also Carter*, 662 F.3d at 1144 (declining to apply the ADAAA retroactively because it went into effect after "the allegedly discriminatory conduct in this case occurred"); *Thornton*, 587 F.3d at 35 n.3 (explaining that the ADAAA does not apply retroactively to "conduct occurring before the Act became effective").

For these reasons, we join the majority of the circuits in deciding the ADAAA does not apply retroactively. Therefore, we will instead look to *Toyota*, *Sutton*, and their progeny.

b.

We first consider whether Reynolds provided evidence on the first ADA definition of disability: whether he had a physical impairment that substantially limited one or more major life activities. *See* 42 U.S.C. § 12102(2)(A). Reynolds primarily cites "lifting" as the major life activity in which he is substantially limited due to his alleged back and neck injuries. Federal regulations have established that lifting is a major life activity, *see* 29 C.F.R. § 1630.2(i)(1), but Reynolds fails to show how he has been "substantially limited" in this regard. Reynolds has not shown that his alleged injuries have "prevent[ed] or severely restrict[ed]" him "from doing activities that are of central importance to most people's daily lives." *Toyota*, 534 U.S. at 198. He has also not shown any evidence that these injuries are "permanent or long term." *Id.*

In fact, the evidence is to the contrary. Reynolds continued to lift things upon his return to work; he did not return to Dr. Mistry (or to any doctor) for a determination that his lifting restriction of fifteen pounds should be permanent; and even at his new job in North Carolina, he took on the task of transporting 195 books, which signals that he did not believe himself to be limited in the activity of lifting. Moreover, the only medical evidence Reynolds provides regarding his alleged limitation is a three-page medical report from Dr. Mistry. Coupled with Dr. Mistry's testimony that he did not believe

Reynolds to be disabled, this evidence does not demonstrate that Reynolds was substantially limited in the life activity of lifting.

Reynolds's argument is further undercut by this court's decision in *Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346 (4th Cir. 1996), *abrogated on other grounds by Baird ex rel. Baird v. Rose*, 192 F.3d 462, 470 (4th Cir. 1999). There, this court held, "a twenty-five pound lifting limitation —particularly when compared to an average person's abilities —does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity." *Id.* at 349. In 2002, this court again found that "mild limitations" such as "the restriction[ ] that [the plaintiff] not lift more than twenty-five pounds or bend repetitively . . . are not significantly restricting . . . under the ADA." *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 470 (4th Cir. 2002); *see also Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 639, 644 (2d Cir. 1998) (inability to lift "very heavy objects" or "anything heavy" was insufficient to establish a substantial limitation on ability to lift as compared to the average person); *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1207 (8th Cir. 1997) ("While lifting is noted under the regulations as a major life activity, a general lifting restriction imposed by a physician, without more, is insufficient to constitute a disability within the meaning of the ADA."). Therefore, Reynolds has not satisfied the first definition of "disabled" under the ADA.[9]

c.

We next address whether Reynolds has satisfied the second definition of disability: having "a record of" a physical impairment that substantially limits one or more major life

---

[9]To the extent Reynolds cites other disabilities (i.e., a blood disorder leading to erectile dysfunction) and other life activities in which he was limited (i.e., working), the record is void of any evidence to support ADA claims based on such allegations.

activities. 42 U.S.C. § 12102(2)(B). On this point, Reynolds bends over backwards to argue that he has provided "a record"—that is, literally *one* medical record—and this should be sufficient to satisfy this requirement.

However, under the applicable definition, we must consider if Reynolds has "a history of, or has been misclassified as having, a . . . physical impairment that substantially limits one or more major life activities." *Rhoads*, 257 F.3d at 391 (internal quotation marks omitted). Reynolds's single proffered medical report is, at best, inconclusive as to the history and extent of his alleged disability, despite the fact that he alludes to "voluminous [medical] records," particularly when this single medical record is coupled with the fact that the doctor who wrote it, Dr. Mistry, testified that he did not believe Reynolds to be disabled. Br. of Appellant 30. Indeed, Reynolds admits he did not provide all relevant medical information, stating,

> It is true that all of the records of Mr. Reynolds' entire medical history were not included as exhibits in his response to summary judgment below. However, the presentment of these voluminous records is unnecessary for purposes of this analysis. It is not the *substance* of these records that is significant in order to reach a decision under this second prong of the ADA's definition of a disability. Instead, it is the *existence* of these records that is consequential here, and the existence of these records is undisputed.

*Id.* (emphasis in original). Contrary to Reynolds's bold assertion, unless the purported medical records were placed in the record — which they admittedly were not — they do not, in fact, exist for the purpose of this appeal. Therefore, by his admission, Reynolds acknowledges that he failed to satisfy his burden of production. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, the nonmoving

party bears the burden of production under Rule 56 to designate specific facts showing that there is a genuine issue for trial." (internal quotation marks omitted)). We therefore conclude Reynolds does not satisfy the second definition of disability.

d.

Finally, Reynolds argues he was, at least, "regarded as" having a physical impairment that substantially limited one or more major life activities, thus satisfying the third definition of disability. 42 U.S.C. § 12102(2)(C). Reynolds must show that his employer "mistakenly believe[d] that [he] ha[d] a physical impairment that substantially limit[ed]" his ability to lift or work. *Sutton*, 527 U.S. at 489. To the contrary, Lockhart expected Reynolds to continue lifting things at work, and Reynolds continued to do so. Lockhart testified that Reynolds had complained of back pain and his blood disorder throughout the time he knew him, but there is no further evidence Lockhart believed these conditions substantially limited Reynolds's ability to lift or work. Reynolds also points to testimony from Clark, specifically that he told Reynolds not to move the baby grand piano because of his back pain. But this statement is nothing more than one of concern for a co-worker, which is simply not enough to satisfy this definition of disability.

Therefore, Reynolds comes up short on each of the three ADA definitions of disability, and we affirm the judgment of the district court with regard to the primary ADA claim.[10]

---

[10]Even if we were obliged to apply the ADAAA to the facts of this case, Reynolds has not proven that he is disabled under its broader definition of "disability." The ADAAA retains the "substantial limitation" language, but it requires a lesser "degree of limitation" than that imposed by *Toyota*. 122 Stat. at 3553-54. "Substantially limits" no longer means "significantly restricted." *Id.* at 3554. Although the revisions are somewhat vague, any findings of disability should be interpreted "consistently with the findings

### 2.    The Retaliation Claim

Reynolds also claims he was terminated by Lockhart and the Chapter in retaliation for (a) requesting that he not be required to lift items exceeding fifteen pounds in weight, and (b) mentioning that he wanted to file a workers' compensation claim.

The ADA's retaliation provision provides, in relevant part, "[n]o person shall discriminate against any individual because such individual . . . made a charge . . . under this chapter." 42 U.S.C. § 12203(a). To establish a prima facie retaliation claim under the ADA, a plaintiff must prove (1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action. *See A Soc'y Without a Name v. Commonwealth of Va.*, 655 F.3d 342, 350 (4th Cir. 2011). Importantly, a plaintiff is not required to prove the conduct he opposed was actually an ADA violation. Rather, he must show he had a "good faith belief" the conduct violated the ADA. *Freilich v. Upper Chesapeake Health*, 313 F.3d 205, 216 (4th Cir. 2002) (internal citations omitted).

As to Reynolds's first grounds for retaliation, his alleged protected conduct is his request that Lockhart honor the fifteen-pound lifting restriction imposed by Dr. Mistry. He claims Lockhart nonetheless required him to move items in excess of the limitation. Even assuming that Reynolds met the first two prongs to establish a prima facie claim of retaliation, as the district court observed, Reynolds "has not proffered any . . . citation to the record demonstrating that there is 'evi-

and purposes of the ADA Amendments Act of 2008" which include "eliminat[ing] discrimination" of disabled persons. *Id.* at 3554-56. Based on the record before us, and for the reasons stated *supra*, Reynolds does not advance evidence sufficient to show that he is disabled or is the type of plaintiff intended to be covered under the original version of the ADA or under the ADAAA.

dence' of a link between the protected activity and his termi-
nation . . . ." J.A. 792. On appeal, Reynolds has similarly
failed to cite to any evidence on the causation element of the
ADA retaliation claim. Therefore, the retaliation claim based
on Reynolds's lifting restriction fails.

The retaliation claim based on Reynolds's workers' com-
pensation inquiry also fails. The ADA's retaliation provision
only prohibits retaliation against a person because the person
"opposed any act or practice made unlawful *by this chapter*"
or "made a charge, testified, assisted or participated in any
manner in an investigation, proceeding, or hearing *under this
chapter*." 42 U.S.C. § 12203(a) (emphases added). Filing a
workers' compensation claim is not something that is covered
by the ADA, but rather by retaliation provisions under state
law. *See* W. Va. Code § 23-5A-1 ("No employer shall dis-
criminate in any manner against any of his present or former
employees because of such present or former employee's
receipt of or attempt to receive benefits under this chapter.").
Thus, Reynolds's retaliation claim based on his workers'
compensation request likewise fails.

### 3.   The Confidentiality Claim

Finally, Reynolds argues, "information obtained regarding
the medical condition or history [of an employee must be]
collected and maintained on separate forms and in separate
medical files and is treated as a confidential medical record."
Br. of Appellant 33 (citing 42 U.S.C. § 12112(d)(3)(B))
(alteration in original). He argues that Lockhart violated this
provision of the ADA by disclosing his "thick blood" medical
condition to "unauthorized individuals." *Id.* at 34.

Again, Reynolds does not have the evidence to support this
claim. First, Reynolds does not fit within the parameters of
this subsection, which applies to "job applicant[s]." 42 U.S.C.
§ 12112(d)(3). But even assuming Reynolds had cited to the
more applicable subsection, which prohibits "mak[ing] [medi-

cal] inquiries of an employee," *id.* § 12112(d)(4)(A), the record clearly shows Reynolds disclosed his medical condition voluntarily to Lockhart, who by all accounts was Reynolds's friend. Lockhart then disclosed the information to another person in order to help Reynolds find a doctor, not for "job-related" purposes. *Id.* Therefore, the district court properly granted summary judgment on this issue.

## B.    The Cross-Appeal

We turn finally to the cross-appeal of the Appellees, where they assert the Chapter and the National Red Cross could not be aggregated in order to meet the fifteen employee threshold required for an "employer" under the ADA. As an initial matter, we are satisfied that the issue of whether the Chapter is an "employer" under the ADA is non-jurisdictional in nature. Previously, we treated the numerosity requirements of the ADA and other employment discrimination statutes as jurisdictional. *See Hukill v. Auto Care, Inc.*, 192 F.3d 437 (4th Cir. 1999) (vacating district court's judgment and remanding with instructions to dismiss for lack of jurisdiction where defendant was not an "employer"). However, this approach does not survive *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006). There, the Supreme Court ruled "the threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue." *Id.* at 516.

Although we have never applied *Arbaugh* to the ADA, courts often look to Title VII—which defines "employer" in essentially the same way as the ADA—for guidance on ADA issues. *Compare* 42 U.S.C. § 12111(5)(a) *with* 42 U.S.C. § 2000e(b); *see also Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 n.2 (6th Cir. 1997) ("Because Title VII, the ADEA, and the ADA define 'employer' essentially the same way, we rely on case law developed under all three statutes." (internal quotation marks omitted)); *EEOC v. AIC Sec. Investigations*, 55 F.3d 1276, 1280 (7th Cir. 1995)

("Courts routinely apply arguments regarding individual liability to all three statutes interchangeably."). Thus, *Arbaugh* dictates that the ADA's employee threshold is not a limit on jurisdiction but, rather, an element of the claim itself.

Next, we conclude that the cross-appeal was not properly taken. A cross-appeal is unnecessary where an appellee "seek[s] nothing more than to preserve [a] judgment in [its] favor." *Vogel v. Linde*, 23 F.3d 78, 79 n.3 (4th Cir. 1994); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. W. Lake Acad.*, 548 F.3d 8, 23 (1st Cir. 2008) ("'A cross-appeal normally is improper when taken by a defendant from a favorable judgment.'") (quoting *United States v. Moran*, 393 F.3d 1, 12 (1st Cir. 2004)). Here, the cross-appeal on whether the Chapter is an "employer" is unnecessary, as it merely seeks affirmance of the district court's judgment on an alternate ground. Therefore, the cross-appeal must be dismissed. *See Nat'l Union*, 548 F.3d at 23 (dismissing cross-appeal from a favorable judgment).

Finally, we vacate the district court's ruling on the employee aggregation issue. Our decision to uphold the district court's grant of summary judgment on the merits of the ADA claim renders moot the dispute concerning whether the Chapter is an "employer." This is because, having affirmed the district court's judgment, our resolution of the question of whether the Chapter is an "employer" would have no practical effect on the outcome of this matter. *See Norfolk S. Ry Co. v. City Of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010) ("A dispute is moot when the parties lack a legally cognizable interest in the outcome. And the parties lack such an interest when, for example, our resolution of an issue could not possibly have any practical effect on the outcome of the matter.") (internal citations and quotation marks omitted). "The customary practice when a case is rendered moot on appeal is to vacate the moot aspects of the lower court's judgment." *Id.* Accordingly, the district court's ruling that the Chapter is an "employer" under the ADA must be vacated.

## IV.

Pursuant to the foregoing, the district court's award of summary judgment to Appellees is affirmed, its ruling that the Chapter is an "employer" under the ADA is vacated, and the cross-appeal is dismissed.

No. 11-2278 *AFFIRMED IN PART*
*AND VACATED IN PART;*
No. 11-2280 *DISMISSED*