UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-2115

PENSKE LOGISTICS LLC; PENSKE TRUCK LEASING CO., L.P.,

Plaintiffs - Appellees,

v.

FREIGHT DRIVERS AND HELPERS LOCAL UNION NO. 557 PENSION
FUND; JOINT BOARD OF TRUSTEES OF THE FREIGHT DRIVERS AND
HELPERS LOCAL UNION NO. 557 PENSION FUND,

Defendants - Appellants.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
J. Frederick Motz, Senior District Judge.  (1:15-cv-03277-JFM)

Argued:  September 13, 2017                          Decided:  January 10, 2018
                        Amended: January 10, 2018

Before TRAXLER, DIAZ, and FLOYD, Circuit Judges.

Vacated and remanded by unpublished opinion.  Judge Floyd wrote the majority opinion
in which Judge Traxler joined.  Judge Diaz wrote a separate opinion concurring in part
and dissenting in part.

**ARGUED:** Corey Smith Bott, ABATO, RUBENSTEIN AND ABATO, P.A., Baltimore,
Maryland, for Appellants.  David R. Levin, DRINKER BIDDLE & REATH LLP,
Washington, D.C., for Appellees. **ON BRIEF:** Paul D. Starr, ABATO, RUBENSTEIN
AND ABATO, P.A., Baltimore, Maryland, for Appellants.  Brian A. Coleman,
Washington, D.C., Mark E. Furlane, DRINKER BIDDLE & REATH LLP, Chicago,

Illinois, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

FLOYD, Circuit Judge:

We are asked to review the district court's affirmance of the Arbitrator's conclusion that Penske Logistics LLC and Penske Truck Leasing Co., L.P. (collectively, "Penske") are not liable for Leaseway Motorcar Transport Co.'s withdrawal liability under the Employee Retirement Income Security Act of 1974 (ERISA). We agree with the Freight Drivers and Helpers Local Union No. 557 (the "Fund") that the Arbitrator did not evaluate the evidence or draw conclusions based on the appropriate burden of proof, and therefore vacate the district court's decision and remand for further proceedings consistent with this opinion.

I.

A.

ERISA provides a statutory framework to promote employee benefit plans in private industries by establishing "minimum standards . . . assuring the equitable character of such plans and their financial soundness." 29 U.S.C. § 1001(a); *see generally* 29 U.S.C. §§ 1301–1461. Congress wanted to guarantee that if a worker has been promised a defined pension benefit upon retirement—and has fulfilled the conditions required to obtain the vested benefit—that the worker will actually receive those benefits. *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 607 (1993). Multiemployer pension plans, structured in accordance with ERISA, provide for the pooling of contributions and liabilities. *See* 29 C.F.R. § 4001. As enacted, however, employers could withdraw from a multiemployer plan, leaving vested benefits unfunded

3

and threatening the plan's solvency. *Concrete Pipe*, 508 U.S. at 608; *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. BES Servs., Inc.*, 469 F.3d 369, 374 (4th Cir. 2006).

To "shore up the financial stability of multiemployer pension plans," *BES Services*, 469 F.3d at 374, the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) amended ERISA to require a withdrawing employer to pay the employer's proportionate share of the plan's unfunded vested benefits by creating withdrawal liability "in rough proportion to that employer's relative participation in the plan over the last 5 to 10 years," *Borden, Inc. v. Bakery & Confectionary Union & Indus. Int'l Pension*, 974 F.2d 528, 530 (4th Cir. 1992). *See also* 29 U.S.C. §§ 1381, 1391; *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984).[1] "An employer owes withdrawal liability when it makes a complete or partial withdrawal from a pension plan." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 440 (4th Cir. 2015) (citing 29 U.S.C. § 1381(a)). An employer's complete withdrawal occurs when an employer permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan, 29

---

[1] "An employer's withdrawal from a multiemployer plan reduced the contribution base, which necessitated an increase in the contribution rate of remaining employers in order to cover the plan's existing unfunded vested benefits. As employers withdrew, the rising costs of continued participation in multiemployer plans increased the incentives for further withdrawals. To reverse this trend, the MPPAA required withdrawing employers to pay their fair share of a plan's unfunded vested benefits by creating withdrawal liability, and provided a streamlined process for resolving disputes over withdrawal liability determinations, thereby limiting dispute-resolution costs and preserving plans' assets." *BES Services*, 469 F.3d at 374 (citations omitted).

4

U.S.C. § 1383(a), and a partial withdrawal occurs when an employer's contribution obligation declines 70% according to the calculation provided in the statute, 29 U.S.C. § 1385(a). *See also Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, n.1 (4th Cir. 1991). "Plan sponsors"—the designated plan administrators—assess withdrawal liability on employers at the end of each year, and ERISA requires that any dispute over the plan sponsor's assessment of liability be subject to arbitration. 29 U.S.C. §§ 1301(a)(10), 1385(a), 1401(a); 29 C.F.R. § 4221.1.

Under the MPPAA, all trades or businesses under common control are treated as a single employer, and each member of the controlled group is liable for the withdrawal of any other member. 29 U.S.C. § 1301(b)(1); 29 C.F.R. § 4001. If a parent company sells the stock of a subsidiary, however, the parent is not liable for the subsidiary's subsequent withdrawal liability unless a principal purpose of the transaction was to evade or avoid withdrawal liability. 29 U.S.C. § 1392(c); *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir.), *cert. denied*, 513 U.S. 987 (1994). The plan sponsors—during their assessment of withdrawal liability—are the first to determine whether a principal purpose of such a transaction was to evade or avoid withdrawal liability. *See* 29 U.S.C. § 1401(e)(1). "[T]he MPPAA makes it clear that an employer can have more than one principal purpose in conducting a transaction," especially when "one principal purpose can be said to motivate the decision about whether to sell the company at all, while another principal purpose can be said to motivate the decision about how to sell the company." *Sherwin-Williams Co. v. N.Y. State Teamsters Conf. Pension & Ret. Fund*, 158 F.3d 387, 395 (6th Cir. 1998); *see also Borden*, 974 F.2d at

5

530 (acknowledging that under 29 U.S.C. § 1384 a company can avoid triggering withdrawal liability by structuring the sale in certain ways).

B.

The Fund is a multiemployer pension plan, organized under ERISA to provide pension benefits to plan participants and their beneficiaries. Leaseway Motorcar Transport Co. ("Leaseway") had long been a contributing employer to the Fund; it employed over 200 Fund participants in 1996, but only 33 by 2003. Penske acquired Leaseway in 1995, and Leaseway became a member of the Penske-controlled group for MPPAA purposes in 1996. On March 26, 2004, Penske sold 100% of the Leaseway stock to Performance Logistics Group (PLG) (the "Transaction") in exchange for a secured $25 million note and 43.5% of the PLG stock, among other things.

In early 2006, the Fund's Board of Trustees―who are the plan sponsors (the "Fund Sponsors")―issued an assessment of withdrawal liability to Penske for the partial withdrawal of Leaseway that was effective December 31, 2004, stating that Leaseway's contribution obligation to the Fund had declined at least 70% in 2004. *See* 29 U.S.C. § 1385(a).[2] Penske objected to the assessment alleging, *inter alia*, that its sale of Leaseway terminated its liability for Leaseway's withdrawal liability. The Fund Sponsors reviewed this objection and determined that a primary purpose of the Transaction was to evade or avoid withdrawal liability such that Penske should retain

---

[2] The Fund seeks satisfaction of this assessment from Penske, in part, because Leaseway had filed for bankruptcy by the time the assessment was completed, and PLG had claims pending before the bankruptcy court.

6

liability for Leaseway's withdrawal. *See* 29 U.S.C. § 1392(c). Penske initiated arbitration to contest its liability and, as is required by statute, paid the withdrawal liability assessed while it awaited review. 29 U.S.C. § 1401(a), (d). Subsequently, the Fund Sponsors assessed Penske for withdrawal liability for Leaseway's second partial withdrawal from the Fund for its declining contribution obligation in 2005, effective December 31, 2005, and then for Leaseway's complete withdrawal in 2006 after ceasing covered operations under the Fund, effective December 15, 2006—both of which Penske also contested. *See* 29 U.S.C. §§ 1383(a), 1385(a). The parties agreed to consolidate the three challenges.

The arbitration record contains over 50,000 pages of documentary evidence gathered over six years of discovery, five days of hearings, and two rounds of briefing, and includes the Arbitrator's Phase One Rulings, issued July 13, 2012, and the 123-page final award (the "Award"), issued September 30, 2015. In the Phase One Rulings, the Arbitrator determined that Penske is not liable for Leaseway's complete withdrawal because unrelated predicates for liability were not satisfied. The Arbitrator's final Award held that Penske is not liable for either of Leaseway's partial withdrawal assessments based on his conclusion that a principal purpose of the Transaction was not for Penske to evade or avoid withdrawal liability. The Arbitrator ruled that the Fund must refund Penske's withdrawal liability payments, amounting to $9,586,345.39, plus interest, and that Penske was entitled to an award of attorneys' fees due to the Fund's discovery abuse. *See* 29 C.F.R. §§ 4219.31(d), 4219.32, 4221.10(c); J.A. 252; *see also* 29 U.S.C. § 1401(d).

7

On October 16, 2015, Penske filed a motion with the Arbitrator for modification of the Award pursuant to 29 C.F.R. § 4221.9(b)(3) to clarify the interest rate and amount of attorneys' fees, and the Fund filed a motion in opposition. With no ruling on the motion and no communication from the Arbitrator, on October 27, 2015, Penske filed a complaint to enforce the Award in district court pursuant to 29 U.S.C. § 1401(b)(2). The Fund responded with a counterclaim to vacate the Award, alleging that the Arbitrator applied the wrong burden of proof to determine whether a principal purpose of the Transaction was to evade or avoid withdrawal liability. The Fund also filed a motion to stay proceedings pending the Arbitrator's consideration of Penske's motion for modification, which the district court denied. The parties filed cross-motions for summary judgment, and the district court summarily affirmed the Award.

## II.

The Fund raises three challenges on appeal: (1) that the court erred in denying its motion to stay the proceedings pending the Arbitrator's decision on the motion for modification; (2) that the court erred in affirming the award because the Arbitrator applied the wrong burden of proof, incorrectly concluded that the burden was satisfied, and clearly erred in reaching several factual conclusions; and (3) that the court erred in determining that the attorneys' fees awarded were reasonable. We address each in turn.

## A.

We reject the Fund's contention that the district court erred in declining to stay the proceedings to wait for the Arbitrator to rule on the motion for modification. The statute

8

does not require a party to wait indefinitely for a response from an arbitrator, and the Public Pension Benefit Guarantee's (the "PBGC") implementing regulation provides that "[t]he arbitrator shall grant or deny the motion for modification or reconsideration, and may render an opinion to support his or decision within 20 days . . . or within 30 days after the motion is filed if an objection is also filed." 29 C.F.R. § 4221.9(c). Although the Fund would read the time limits as prescribing only the ability of the arbitrator to issue a supporting opinion, we believe such a reading is illogical. There is no colorable argument why the regulation would be concerned with limiting the ability of an arbitrator to provide a written explanation for his ruling, but not his underlying power to do so. Accordingly, we take the clear meaning of the PBGC's regulation to mean that when the Arbitrator failed to grant or deny the motion in accordance with the 30-day regulatory time limit, the district court was permitted, pursuant to 29 U.S.C. § 1401(b)(2), to enforce, vacate, or modify the award. Therefore, the court did not abuse its discretion in denying the Fund's motion to stay the proceedings.

B.

Next, we consider the Fund's contention that the court erred in affirming the award. This Court reviews a district court's grant of summary judgment de novo, applying the same standards as the district court. *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 149 (4th Cir. 2012). When considering an arbitrator's award issued under the MPPAA, this Court reviews findings of fact for clear error and conclusions of law de novo. *See* 29 U.S.C. § 1401(c); *BES Services*, 469 F.3d at 375. Under the terms of the statute, "there shall be a presumption, rebuttable only by a clear preponderance of the

9

evidence, that the findings of fact made by the arbitrator were correct." 29 U.S.C. § 1401(c).

In assessing withdrawal liability, the plan sponsor makes a factual determination of whether a principal purpose of a parent company's stock sale of its subsidiary was to evade or avoid withdrawal liability. Under ERISA, as clarified in *Concrete Pipe*, this factual finding is entitled to a presumption of correctness. *See* 29 U.S.C. §§ 1392(c), 1401(a)(3)(A); *Concrete Pipe*, 508 U.S. at 620–21. An employer challenging this finding has "the burden . . . to disprove [the] challenged factual determination by a preponderance." *Concrete Pipe*, 508 U.S. at 629; *see also* 29 U.S.C. § 1401(a)(3)(A) ("[A]ny determination made by a plan sponsor under [29 U.S.C. § 1392(c)] is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous."). "Congress intended to shift the burden of persuasion to the employer in a dispute over a sponsor's factual determination," *Concrete Pipe*, 508 U.S. at 629, to prevent the employer from "forcing the plan sponsor to prove every element involved in making an actuarial determination," *id.* at 628. "It is indeed entirely sensible to burden the party more likely to have information relevant to the facts about its withdrawal from the Plan with the obligation to demonstrate that facts treated by the Plan as amounting to a withdrawal did not occur as alleged." *Id.* at 626. However, other factual and legal determinations made by the plan sponsor, including the legal determination of whether an employer is liable for withdrawal liability, are reviewed de novo by the arbitrator.

10

Here, the Fund Sponsors determined that Penske was liable for Leaseway's withdrawal liability, despite having sold Leaseway, based on their factual determination that a principal purpose of the Transaction was for Penske to evade or avoid withdrawal liability. The parties agree that Penske has the burden to disprove this challenged factual finding. *See id.* at 629. The parties disagree, however, on whether this burden was actually applied by the Arbitrator. We agree with the Fund that the Arbitrator erroneously placed the burden on the Fund to prove by a preponderance that a principal purpose of the Transaction was to evade or avoid withdrawal liability, and that this failure to apply the correct burden amounted to clear error.

In the entire 123-page Award, the Arbitrator never once concludes that Penske disproved by a preponderance that a principal purpose of its stock sale of Leaseway was to evade or avoid withdrawal liability. Instead, the Arbitrator concluded Penske was not liable because *the Fund failed to prove* evasion or avoidance as a principal purpose of the Transaction. The Arbitrator expressly "found that the preponderance of the record evidence failed to establish that a principal purpose of the Transaction was to evade or avoid withdrawal liability . . . ." J.A. 132; *see also* J.A. 118 (titling a subsection in the Award, "The Record Failed to Substantiate the Fund's Claim that a Principal Purpose of the Transaction was to Evade or Avoid Withdrawal Liability"). This error is particularly glaring because the Arbitrator correctly applied the burden to an unrelated finding that was also entitled to a presumption of correctness. *See* J.A. 132 ("Penske has failed to shoulder its burden under *Concrete Pipe* to prove by a preponderance of the evidence that

11

the [Fund Sponsor's] determination that Leaseway suffered a partial withdrawal due to a 70% decline in [contribution base units] is incorrect . . . .").

A review of the Award in its entirety confirms our conclusion. The Arbitrator's statements throughout the Award indicate that his findings resulted from a lack of evidence that a principal purpose was to evade or avoid withdrawal liability, thereby erroneously placing the burden on the Fund rather than the Employer. For example, the Arbitrator stated that "[t]here was no direct evidence of any intent to evade or avoid withdrawal liability by Penske." J.A. 120. But, under the correct burden, the Arbitrator should have found evidence *disproving* that Penske intended to evade or avoid withdrawal liability. By stating, "I am unable to find that withdrawal liability was a principal purpose of Penske selling Leaseway to PLG in the form of a stock sale," the Arbitrator again failed to apply the required presumption of correctness and did not place the burden on Penske. J.A. 130. This failure is contrary to Congress's clear intent to "burden the party more likely to have information relevant to the facts about its withdrawal from the Plan with the obligation to demonstrate that facts treated by the Plan as amounting to a withdrawal did not occur as alleged." *Concrete Pipe*, 508 U.S. at 626; *see also* J.A. 121 (stating that evidence did not "warrant[] an inference that a principal purpose of the Transaction was to evade or avoid withdrawal liability"); J.A. 131 ("[T]he fact that a business is sold as a stock transaction without more does not give rise to an inference that a principal purpose of the sale is to evade or avoid the imposition of withdrawal liability.").

12

We also reject the notion that the few instances in which the Arbitrator mentions the correct burden can cure the Arbitrator's failure to apply the presumption of correctness as statutorily required. Most notably, although the Arbitrator initially stated the burden of proof correctly in his July 2012 ruling—in advance of his Award ruling—the next page of that ruling offered a follow-up statement indicating how he would apply the incorrect burden:

> If the preponderance of the evidence establishes that a principal purpose of the transaction was to evade or avoid withdrawal liability, then the March 26, 2004 stock sale will be disregarded when determining Penske's liability for Leaseway's withdrawal(s). If, on the other hand, the preponderance of the evidence fails to establish that a principal purpose of the transaction was to evade or avoid withdrawal liability, then the [] stock sale will be given full effect . . . . The issue of burden of proof would be significant in this case, therefore, only in the highly improbable situation that the totality of the evidence on this question, viewed as a whole, is equally balanced.

J.A. 190. This statement reflects that the Arbitrator was erroneously looking for evidence proving what the Fund Sponsors had already determined, instead of looking for evidence disproving that fact. And although the Arbitrator stated that, "[Mr. Angelbeck's] testimony that the evasion or avoidance of withdrawal liability was not a principal purpose (or even a non-principal purpose) of the Transaction is supported by a number of record facts," without more, we decline to find that this single reference to one witness is a conclusive statement by the Arbitrator that Penske met its burden. J.A. 119.

Upon reviewing the entire Award, there is insufficient evidence that the Arbitrator reached his conclusions under the correct burden. By ignoring the presumption of correctness and instead requiring the Fund to prove that evasion or avoidance was a principal purpose of the Transaction, the Arbitrator committed clear error.

13

Moreover, we decline to find that this error is harmless. Because the Arbitrator was analyzing and applying the facts under the wrong burden, the error impacts nearly every finding made and will likely require review of the entire arbitration record. Undertaking this extensive review ourselves would undermine ERISA's express intention for these matters to be handled in arbitration rather than in the courts. 29 U.S.C. § 1401(a) ("Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration."); *see also Concrete Pipe*, 508 U.S. at 630 ("[T]he arbitrator's decision fails to reveal the force with which factual conclusions by the trustees here were presumed correct, and in such a case we would ordinarily reverse the judgment below for consideration of the extent to which the arbitrator's application of the presumption was contrary to the construction we adopt today."). Therefore, we decline to opine about whether the evidence supports the same conclusions under the correct burden, and whether the Arbitrator erred by ignoring or failing to consider material evidence in reaching his conclusions, and remand for further proceedings.

C.

Finally, we consider the Fund's contention that the attorneys' fees awarded to Penske were not reasonable because the Arbitrator did not follow the United States District Court for the District of Maryland Local Rules, Appendix B, in determining the amount of the fees. Because we are vacating the court's affirmance of the Award and remanding for further consideration, we decline to consider whether the court erred in determining that the attorneys' fees issued as part of that Award were reasonable.

14

III.

For the foregoing reasons, the judgment of the district court is

*VACATED AND REMANDED.*

DIAZ, Circuit Judge, dissenting in part[1]:

My colleagues rely on a few inartful sentences in a 123-page opinion to conclude the Arbitrator misstated, and therefore, presumably misapplied the burden of proof in this case. According to the majority, the Arbitrator was "erroneously looking for evidence proving what the Fund Sponsors had already determined" as to Penske's principal motivation for selling Leaseway (the "Transaction"). Maj. Op. at 13. In their view, given the presumption of correctness owed to a Fund's determination under the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), the Arbitrator should instead have been "looking for evidence *disproving*" that determination. Maj. Op. at 13 (emphasis added).

This error (says the majority) "impacts nearly every finding made and [thus] likely require[s] review of the entire arbitration record." Maj. Op. at 14. Inexplicably, however, my colleagues claim that conducting such an "extensive review ourselves would undermine ERISA's express intention for these matters to be handled in arbitration rather than in the courts." Maj. Op. at 14. Consequently, they punt, opting instead to require the Arbitrator to start over. Because this disposition rests on a flawed understanding of the Arbitrator's opinion, ignores the record, and undermines clear congressional objectives, I respectfully dissent.

---

[1] While I concur in the majority's conclusion that the district court did not err in declining to stay the proceedings, I dissent as to the remaining portions of the opinion, including parts II.B and II.C.

## I.

First, I do not agree that the Arbitrator applied the incorrect burden of proof. Rather, the framework the Arbitrator set out in his July 2012 ruling, and which the majority quotes at *ante* 13, states the question that needs to be answered, the requisite degree of certainty with which it needs to be answered, and what is to happen if the evidence is equipoised. My colleagues are no fans of the Arbitrator's syntax, but that alone does not constitute legal error.

Second, even if the Arbitrator did apply the wrong burden, we are still obligated to review both the Arbitrator's findings of fact and conclusions of law. 29 U.S.C. § 1401(c). The former category includes the Arbitrator's determination regarding the principal purposes of the transaction, which we review for clear error. *See Sherwin-Williams Co. v. N.Y. State Teamsters Conference Pension, Ret. Fund*, 158 F.3d 387, 393 (6th Cir. 1998). Under this standard, we may reverse the arbitrator's findings only if, "after reviewing the entire record, we are left with the definite and firm conviction that a mistake has been committed." *Id.* (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 570 (1985)).

My colleagues mistakenly decline to consider whether the Arbitrator clearly erred in finding "Penske's principal motivations in looking to sell Leaseway were business motivations, not the evasion or avoidance of withdrawal liability." J.A. 120. There was no such error. Penske offered evidence disproving the Fund's claim that avoiding withdrawal liability was a principal purpose behind the Transaction. And after presenting

17

its affirmative evidence, Penske rebutted the Fund's case by pointing out the lack of "direct evidence of any intent to evade or avoid withdrawal liability." J.A. 120.

Despite quoting from and criticizing language found at the end of the award, the majority does not address the first ninety-eight pages of the Arbitrator's decision, which detail the evidence offered by both sides. This lengthy discussion makes clear that the Arbitrator's findings rest on evidence offered by Penske, not on the Fund's failure to meet a misapplied burden. Some of the critical evidence the Arbitrator considered includes: (1) Penske's continuous efforts to sell Leaseway since acquiring the company in 1995; (2) Penske's limited knowledge of any withdrawal liability linked to Leaseway; and (3) Penske's belief that Performance Logistics Group ("PLG") would be a profitable company following the Transaction. J.A. 120–26.

The record shows that Penske's original reason for purchasing Leaseway was to obtain its advanced computer logistics system, and because neither of Leaseway's two operating units aligned with Penske's core businesses, its plan was always to resell the company. Penske sold Leaseway's leasing unit in August 1996 and had been in talks to sell the auto-carrier division as early as March 1996. J.A. 89. Though this effort fell through, Penske talked with three other buyers in 1998, 1999, and 2000. J.A. 120. Importantly, these efforts all occurred when the Fund had no withdrawal liability, and the record is devoid of any other ERISA liability linked to Leaseway during that time. While sales talks with PLG did not begin until early 2002, the Arbitrator noted (I believe correctly) that this "prior behavior is strong evidence that Penske's principal motivations

18

in looking to sell Leaseway were business motivations, not the evasion or avoidance of withdrawal liability." J.A. 120.

The Arbitrator also considered internal documents and testimony from Penske executives, which showed that Penske had little knowledge of any withdrawal liability linked to Leaseway even when it was finally sold in 2004. J.A. 83, 97. The only concurrent document discussing possible pension liability tied to Leaseway was a 2003 diligence chart identifying just under $20 million in withdrawal liability for *all* Penske controlled groups. J.A. 83; 97–98. But that figure was also contingent on Leaseway and or Penske ceasing their contributions to the relevant pension funds, something Penske did not believe was likely to happen. J.A. 129. Because there was "no indication that Penske was in possession of any information that reasonably should have suggested" it would be "responsible for complete withdrawal liability to the Fund," the Arbitrator reasonably concluded that the amount of withdrawal liability was not "demonstrated to be a motivating factor." J.A. 126, 129.

Finally, the Fund's case rests heavily on the assumption—born of hindsight—that PLG was not economically viable, and therefore any equity Penske received as part of the Transaction was worthless. From this premise, the Fund offered expert testimony that the Transaction only made sense if viewed as a way of shedding $20 million in potential withdrawal liability. But Penske attacked both the logic of this conclusion and its factual premise. The Arbitrator found nothing to support the Fund's assertion that "Penske knew or should have known that the stock was, and would be, worthless," relying instead on evidence which "revealed that Penske believed that PLG would be a viable and profitable

19

concern." J.A. 122. The reasonableness of Penske's subjective belief was bolstered by the actions of investment banks and private equity firms, which "after performing their due diligence, similarly believed in the viability of PLG after the Transaction as evidenced by their willingness to make significant loans to PLG, as did PLG's backers." J.A. 122–23. Thus, rather than ditching Leaseway "to evade or avoid withdrawal liability," the record shows that Penske anticipated Leaseway to survive in the form of a "merged business" with PLG that would produce "significant savings." J.A. 122.

On this record, I am unable to come to the definite and firm conviction that a mistake has been made. Accordingly, I would affirm the Arbitrator's award in its entirety.[2]

---

[2] Given its disposition, the majority does not reach the Arbitrator's separate award of attorneys' fees. The Arbitrator awarded fees due to the Fund's discovery misconduct pursuant to 29 C.F.R. § 4221.10, which is largely analogous to Fed. R. Civ. P. 37. The only requirement from the text of § 4221.10 is that the fees be reasonable, and the Fund claims that the district court erred by not considering Appendix B of the District of Maryland Local Rules on the question of the reasonableness of the award. This argument is without merit.

By its terms, Appendix B applies to fee awards for a "prevailing party." *Local Rules, United States District Court for the District of Maryland, Appendix B* (July 2016). The problem for the Fund is that Penske need not be a prevailing party to receive a fee award under § 4221.10. Unlike the fee-shifting statutes addressed by Appendix B, the fees awarded here serve as a sanction for discovery misconduct and compensate Penske regardless of its success on the underlying merits. The district court was therefore not obligated to consult Appendix B before ruling on the reasonableness of the award. While the Fund could have attacked reasonableness on other grounds, it failed to do so. Accordingly, I would affirm the award of attorneys' fees.

II.

The majority's decision to vacate the award also frustrates clear congressional objectives. The MPPAA requires arbitration in order to "create a more efficient dispute-resolution process," "thereby limiting dispute-resolution costs and preserving plans' assets." *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. BES Servs., Inc.*, 469 F.3d 369, 374 (4th Cir. 2006). This streamlined process includes judicial review of an award, but with the understanding that the arbitrator's decision is "presumptively correct and may be rebutted only by a clear preponderance of the evidence." *Republic Indus., Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund*, 718 F.2d 628, 641 (4th Cir. 1983).

By refusing to consider whether the evidence supports the award in spite of the Arbitrator's alleged mistake regarding the burden of proof, the majority gives short shrift to this carefully crafted statutory scheme and (regrettably) exalts form over substance.

I respectfully dissent.