Granted by Supreme Court 7/1/2014
Vacated and Remanded by Supreme Court March 25, 2015

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

Peggy Young,

    *Plaintiff-Appellant,*

  v.

United Parcel Service, Inc.,

    *Defendant-Appellee,*

  and

United Parcel Service of America, Inc.; UPS Health Program; Aetna Life Insurance Company; Aetna Disability and Absence Management,

    *Defendants.*

    No. 11-2078

American Civil Liberties Union Foundation; American Civil Liberties Union Foundation of Maryland; A Better Balance; Equal Rights Advocates; Legal Aid Society - Employment Law Center; Legal Momentum; National Partnership for Women & Families; National Women's Law Center; Public Justice Center;

SOUTHWEST WOMEN'S LAW CENTER;
WOMEN'S LAW CENTER OF
MARYLAND, INC.; WOMEN'S LAW
PROJECT,

    *Amici Supporting Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, Chief District Judge.
(8:08-cv-02586-DKC)

Argued: October 24, 2012
Decided: January 9, 2013
Amended: April 10, 2015

Before WILKINSON, GREGORY, and DUNCAN,
Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Wilkinson and Judge Gregory joined.

## COUNSEL

**ARGUED:** Sharon Fast Gustafson, Arlington, Virginia, for Appellant. Emmett F. McGee, Jr., JACKSON LEWIS, LLP, Baltimore, Maryland, for Appellee. **ON BRIEF:** Jill S. Distler, JACKSON LEWIS, LLP, Baltimore, Maryland, for Appellee. Ariela M. Migdal, Lenora M. Lapidus, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Deborah A. Jeon, ACLU FOUNDATION OF MARYLAND, Baltimore, Maryland, for Amici Curiae.

## OPINION

DUNCAN, Circuit Judge:

In 1978, Congress passed the Pregnancy Discrimination Act (the "PDA"), which amended the definition of discrimination on the basis of sex in Title VII of the Civil Rights Act of 1964 ("Title VII") to provide that it included discrimination in employment "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Invoking both the PDA and the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, Peggy Young ("Young") appeals the district court's grant of summary judgment for her employer, United Parcel Service, Inc. ("UPS"). For the reasons that follow, we affirm.[1]

I.

A.

In reviewing a grant of summary judgment, we recite the facts in the light most favorable to Young as the non-moving party. *Dulaney v. Packaging Corp. of America*, 673 F.3d 323, 324-25 (4th Cir. 2012). Three UPS policies lie at the core of this dispute. First, UPS defined among the essential functions for all drivers the ability to "[l]ift, lower, push, pull, leverage and manipulate . . . packages weighing up to 70 pounds," and to "[a]ssist in moving packages weighing up to 150 pounds," J.A. 577.

Second, the applicable Collective Bargaining Agreement (the "CBA") provides temporary alternate work ("TAW")[2] to employees "unable to perform their normal work assignments due to an *on-the-job injury*." J.A. 580 (emphasis added). To

---

[1]The American Civil Liberties Union (the "ACLU") submitted an amicus brief in support of Young.

[2]We use TAW and light duty work interchangeably.

comply with this CBA provision, UPS offers light duty work to those employees injured while on the job or suffering from a permanent impairment cognizable under the ADA. Under UPS policy and the CBA, a pregnant employee can continue working as long as she can perform the essential functions of her job, but is ineligible for light duty work for any limitations arising solely as result of her pregnancy.

Finally, a CBA provision requires UPS to give an "inside job" to drivers who have lost their certification by the Department of Transportation (the "DOT") because of a failed medical exam, a lost driver's license, or involvement in a motor vehicle accident as long as the driver is capable of performing such a job. Because an inside job often involves heavy lifting, it is typically not considered light duty work.

Against this backdrop, we turn to the facts before us. We begin with a general statement of facts, providing additional information as necessary to the analysis.

Young started working for UPS in 1999, and began driving a delivery truck in 2002. By 2006 and throughout the relevant period, Young held a position as a part-time, early morning driver, also known as an "air driver," apparently in reference to her responsibility to pick up and deliver packages that had arrived by air carrier the previous night. Young worked out of a UPS facility in Landover, Maryland known as the "D.C. Building." Each morning after clocking in at the D.C. Building and inspecting her delivery van, Young and other air drivers would meet a shuttle from the airport bearing letters and packages scheduled for immediate delivery. Air drivers were then responsible for loading their vans and making deliveries. Young typically finished her work responsibilities by 9:45 or 10 in the morning, and then proceeded to her second job at a flower delivery company.

In July 2006, following two unsuccessful rounds of *in vitro* fertilization, Young requested a leave of absence to try a third

round. The UPS occupational health manager, Carolyn Martin, granted Young's request. When Young became pregnant, she sought to extend her leave. At some point in September 2006, she left with her supervisor a note from Dr. Thaddeus Mamlenski indicating that she should not lift more than twenty pounds for the first twenty weeks of her pregnancy and not more than ten pounds thereafter. Young soon followed up with a phone call to Martin saying that she was not yet ready to return to work.

During that September 2006 call, Martin informed Young that UPS policy would not permit her to continue working as long as she had the twenty-pound lifting restriction. Young maintains that she sought to explain to Martin that her job rarely required her to lift over twenty pounds, that other UPS employees had in any case agreed to assist her, and that she was willing to do either light duty work or her regular job. Young characterized the seventy-pound lifting requirement as illusory because she rarely had to transport large packages, and when she did, she could use a hand truck or request assistance from other UPS employees.

On October 11, 2006, Young had a check-up with midwife Cynthia Shawl. At the conclusion of her check-up, Shawl drafted and signed a short note on National Naval Medical Center letterhead stating "Peggy Sue Young is currently pregnant and due to deliver on or about May 2, 2007. Due to her pregnancy it is recommended that she not lift more than 20 pounds." J.A. 510 (the "Shawl note"). The Shawl note also indicated Shawl was available to provide further information or answer questions, and listed contact information for her. Although Shawl did not typically draft such notes, she did so in this instance because Young had told her she needed "a letter for work stating her restrictions." J.A. 656.[3]

---

[3]The chronological record of medical care indicates Shawl saw Young for 40 minutes and includes the notation "Released w/o Limitations." J.A. 509. Although Young emphasizes in her brief the tension between the Shawl note and the "Released w/o Limitations" notation, she does not suggest, and the record does not support, the conclusion that Martin or anyone at UPS ever saw the "Released w/o Limitations" notation.

At some point after her appointment with Shawl, Young contacted her supervisor at the D.C. Building and requested to return to work. When Young informed her supervisor of the note recommending she not lift more than twenty pounds, her supervisor referred Young to Martin. After speaking with Young, Martin concluded that, based on UPS policy, Young was unable to perform the essential functions of her job and was ineligible for light duty assignment. It is undisputed that Martin made this determination alone.

Young and Martin spoke by phone at the end of October 2006. In the course of discussing Young's lifting limitation and eligibility for work, Martin explained to Young that (1) UPS offered light duty for those with on-the-job injuries, those accommodated under the ADA, and those who had lost DOT certification, but not for pregnancy; (2) Young did not qualify for short-term disability benefits because she had presented no note stating she could not work at all; (3) Young had exhausted her leave under the Family and Medical Leave Act (the "FMLA"); and (4) UPS policy did not permit Young to continue working as an air driver with her twenty-pound lifting restriction. Although Martin "empathize[d] with [Young's] situation and would have loved to help her," J.A. 1032, Martin believed she was required to treat Young the same as she would any other UPS employee who had a lifting restriction that did not result from an on-the-job injury or illness and who could not perform his or her regular job. According to Martin, she would have allowed Young to return to work if Young could provide a medical certification removing her lifting restriction and stating she could perform the essential functions of her job.

The parties do not dispute that Martin based her decision to disallow Young from returning to work solely on the basis of the lifting limitations imposed by Mamlenski and Shawl. Martin did not believe Young had any other restrictions, and asserts that had she considered Young disabled within the meaning of the ADA, she would have encouraged Young to

apply for an accommodation in accordance with UPS's ADA policy. J.A. 575. Although Young takes issue with Martin's failure to contact Shawl and seek more information regarding the recommended lifting restriction, Young does not controvert Martin's assertion.

Still seeking to return to work, Young approached Myron Williams, the Capital Division Manager in the D.C. Building, in November 2006. According to Young, when she explained her desire to return to work, Williams told her she was "too much of a liability" while pregnant and that she "could not come back into the [D.C.] [B]uilding until [she] was no longer pregnant." J.A. 500.

By November 2006, Young's FMLA leave had expired. She then went on an extended leave of absence, receiving no pay and eventually losing her medical coverage by the end of the year. During this extended leave, someone—the record does not disclose who—at UPS ascribed Young's absence to "disability" by placing the code for disability on her attendance chart. A UPS employee explained at his deposition that the disability code does not necessarily mean that the employee is on approved disability leave; it in some cases means only that an employee is "not working because of an off the job situation." J.A. 1836.

Young gave birth on April 29, 2007, and returned to work for UPS at some point thereafter.

B.

Young filed a charge with the Equal Employment Opportunity Commission (the "EEOC") on July 23, 2007, and later amended it. She alleged discrimination on the basis of race,[4] sex, and pregnancy. After the EEOC issued Young a right to

---

[4]Young is white, and alleged that UPS permitted African-American pregnant employees to work.

sue letter in September 2008, she filed suit in October 2008. In an amended complaint filed the same month, Young sought damages for sex and race discrimination under Title VII and for disability discrimination under the ADA. When Young sought to amend her complaint a third time in June 2009 to add a distinct disparate impact claim, the district court denied her motion.

Following over eighteen months of discovery, UPS moved for summary judgment in July 2010. In addition to responding in opposition to UPS's summary judgment motion, Young also sought to compel additional discovery, asked for a continuance under Rule 56(d) of the Federal Rules of Civil Procedure, and moved to dismiss voluntarily her race discrimination claim. In an opinion issued in February 2011, the district court granted summary judgment for UPS and denied Young's motions for additional discovery, a continuance, and a dismissal of her race discrimination claim.[5] On Young's ADA claim, the district court reasoned that UPS had not discriminated against Young either by asking for a doctor's note, which it was permitted to do under the circumstances, or by deciding not to accommodate her.

Applying the Title VII burden shifting analysis under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to Young's PDA claim, the district court concluded Young had not shown direct evidence of discrimination; failed to establish a prima facie case of sex discrimination because she could identify no similarly situated comparator who received more favorable treatment than she did; and in any case could not show that UPS's non-discriminatory rationale for its decision was pretextual.

The district court denied Young's motion for reconsideration in August 2011. This appeal followed.

---

[5]The district court granted summary judgment in favor of UPS on Young's race discrimination, and Young does not challenge this on appeal.

## II.

Young challenges the district court's grant of summary judgment on her ADA and PDA claims. First, she claims that UPS impermissibly regarded her as disabled under the ADA. Second, Young contends that UPS discriminated against her on the basis of pregnancy in violation of the PDA.[6] In considering these arguments, we review the district court's grant of summary judgment de novo, and construe all the documentary evidence and inferences available therefrom in the light most favorable to Young. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Summary judgment is appropriate if UPS establishes "that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Thus, a genuine issue of material fact, and not simply "the mere existence of *some* alleged factual dispute between the parties," *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986), is required to defeat UPS's motion. We turn first to Young's ADA claim.

## A.

The ADA prohibits discrimination against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).[7] To

---

[6]Young also makes two arguments we need not consider at length. First, she contends that the district court erred by denying her motion to amend her complaint to include a disparate impact claim. *See* Appellant's Br. at 65-66. We review a district court's decision to deny a motion to amend for abuse of discretion, *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 192 (4th Cir. 2009), and find no such abuse here. Young failed to satisfy the good cause standard under Fed. R. Civ. P. 16(b)(4) to modify the scheduling order. J.A. 126. Second, Young asserts error in the district court's decision to deny her motion to compel additional discovery. The district court had permitted over eighteen months of discovery, and had already twice granted Young's motions to compel. Its decision to cut off discovery when it did was not an abuse of discretion.

[7]Congress amended the ADA in 2008 in order to expand the category of individuals who fall within its ambit. *See* ADA Amendments Act of 2008 (the "ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553; *see also*

establish disability discrimination, Young must demonstrate that (1) she had a disability as defined in the ADA; (2) she was a "qualified individual," which entails being able to perform the essential functions of her job; and (3) UPS took an adverse action against her on account of her disability. *See Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997). Young's claim fails because she cannot establish the first of these elements.[8]

The ADA provides three avenues for establishing the existence of a disability: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Young does not press the argument that her pregnancy alone establishes disability. *See, e.g.*, *Wenzlaff v. NationsBank*, 940 F. Supp. 889, 890 (D. Md. 1996) ("With near unanimity, federal courts have held that pregnancy is not a 'disability' under the ADA."). Rather, she contends that UPS regarded her pregnancy-related work limitations as such.

A "regarded as" disabled claim "includes the circumstance when the employer 'mistakenly believes that an actual, non-

---

*Reynolds v. American Nat'l Red Cross*, ___ F.3d ___, No. 11-2278, 2012 WL 6062702, at *5 (4th Cir. Dec. 7, 2012) ("In passing the ADAAA, Congress was concerned 'lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities.'" (quoting ADAAA, 122 Stat. at 3553)). Because Young filed her claim before the effective date of the amendments, which Congress did not make retroactive, *Reynolds*, 2012 WL 6062702, at *6 (ADAAA not retroactive to cases filed before its enactment); *see also Boitnott v. Corning Inc.*, 669 F.3d 172, 174 n.3 (4th Cir. 2012) (same), we do not consider how, if at all, the ADAAA's amendments would affect Young's ADA claim.

[8]Because Young's claim founders at the first prong, we do not decide whether Young was a "qualified individual" or whether the ADA's "reasonable accommodation" requirement attaches to those who are regarded as disabled.

limiting impairment substantially limits one or more major life activities.'" *Wilson v. Phoenix Specialty Mfg. Co., Inc.*, 513 F.3d 378, 384-85 (4th Cir. 2008) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)). Thus, the employer "must believe . . . that [an individual] has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton*, 527 U.S. at 489. Major life activities are "those activities that are of central importance to daily life," such as walking, seeing, and hearing. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002).[9] Finally, where an employee relies on a "regarded as" disabled theory, we focus "on the reactions and perceptions of the employer's decisionmakers . . . ." *Wilson*, 513 F.3d at 385 (quoting *Runnebaum v. NationsBank of Md., N.A.*, 123 F.3d 156, 172-73 (4th Cir.1997), *abrogated on other grounds by Bragdon v. Abbott*, 524 U.S. 624 (1998)) (internal alteration omitted).

Young identifies three actions on Carolyn Martin's part as evidence that UPS regarded her as disabled: soliciting from Young a doctor's opinion that she was no longer under any lifting limitations; preventing Young from working based only on the Shawl note without independently evaluating Young's ability to work or contacting Shawl for more information; and improperly relying on a mistaken belief about Young's capacity for work. We briefly consider each.

The argument that Martin improperly solicited the doctor's opinion is unclear. The record reflects no evidence that Young provided such an opinion to anyone.[10] The only doctor's notes

---

[9] Both *Toyota Motor Mfg.* and *Sutton* interpret the ADA before the 2008 amendments. Although the ADAAA effectively overruled the interpretation offered in these cases, we consider them because we analyze Young's claims under the pre-2008 ADA. *See supra* note 7.

[10] The district court had the same concern, noting that Young had not pleaded in her amended complaint the claim that UPS had improperly solicited a doctor's note from her. J.A. 417.

in the record are those from Dr. Mamlenski and midwife Cynthia Shawl, suggesting Young lift no more than twenty pounds. Thus, to the extent Young either claims Martin improperly solicited the Shawl note or takes issue with Martin's request that Young provide medical certification that she was no longer under the lifting restrictions indicated in the notes from Mamlenski and Shawl, we agree with the district court's view that "[b]ecause UPS possessed objective facts suggesting Young might have lost the ability to perform central job functions, it had a legitimate reason to seek some verification that Young had recovered her ability to perform those duties." J.A. 420; *see also Porter v. U.S. Alumoweld Co.*, 125 F.3d 243, 247 (4th Cir. 1997) (holding employer's medical inquiry was job-related and consistent with business necessity when employee returned to job involving lifting after back surgery).

Young's second contention—that UPS had a duty to seek additional information from her healthcare providers and independently evaluate her ability to work—is similarly unavailing. In Young's view, UPS should have engaged in an interactive process to determine whether Young was capable of performing her job. Although the ADA does advise an employer to initiate "an informal, interactive process" when determining whether an individual with a disability needs an accommodation, *see* 29 C.F.R. § 1630.2(o)(3), no such counsel applies to the determination of whether an employee is disabled in the first instance. Young presents no rationale, compelling or otherwise, for concluding that an employer acts inappropriately in relying on the employee's own objective medical evidence. *Cf. Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 784 (8th Cir. 2006) ("If a restriction is based upon the recommendations of physicians, then it is not based upon myths or stereotypes about the disabled and does not establish a perception of disability.").[11]

---

[11]Although the two documents produced by Cynthia Shawl—the "Released w/o Limitations" notation and the Shawl note—stand in consider-

Finally, Young fails to marshal evidence creating a genuine issue of material fact on the question of whether Martin had a mistaken belief regarding Young's capacity for work. Young offers no evidence indicating Martin believed Young's pregnancy substantially limited one or more of her major life activities. The most the record establishes is that Martin believed Young to be pregnant and under a temporary lifting restriction on account of her pregnancy, based on the evidence Young herself provided. Given the relatively manageable weight restriction—twenty pounds—and the short duration of the restriction, there is no evidence that Young's pregnancy or her attendant lifting limitation constituted a disability within the meaning of the ADA. *See Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 349 (4th Cir. 1996) ("[W]e hold, as a matter of law, that a twenty-five pound lifting limitation—particularly when compared to an average person's abilities—does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity."), *abrogated on other grounds by Baird ex rel. Baird v. Rose*, 192 F.3d 462, 470 (4th Cir. 1999); *Pollard v. High's of Baltimore*, 281 F.3d 462, 468 (4th Cir. 2002) ("[T]emporary impairments usually do not fall within the ADA's definition of 'disability.'"). Because Young points to no more than the objective fact of her pregnancy, and offers no evidence tending to show that Martin subjectively believed Young to be disabled, Young cannot adduce evidence to raise a factual issue on her "regarded as" claim.[12]

---

able tension, nothing in the record indicates anyone from UPS ever saw the former document. Having no reason to believe Young's doctor-recommended lifting restriction had abated, Martin was under no obligation to consult with Shawl or otherwise seek out more information.

[12]The fact that Young was coded as "disabled" standing alone does not alter this conclusion because there is no evidence in the record linking this coding to a decisionmaker who worked with Young. *See Wilson*, 513 F.3d at 385.

## B.

We turn next to the heart of Young's appeal, that UPS violated the Pregnancy Discrimination Act. Although not free from ambiguity, Young's core contention appears to be that the UPS policy limiting light duty work to some employees—those injured on-the-job, disabled within the meaning of the ADA, or who have lost their DOT certification—but not to pregnant workers like Young violates the PDA's command to treat pregnant employees the same "as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). In a similar vein, the ACLU amicus brief argues that the PDA requires employers like UPS to provide pregnant workers like Young light duty work so long as it does so for any other workers similar in their ability or inability to work even though it concededly does not do so for all nonpregnant employees.

We analyze a PDA claim as a sex discrimination claim under Title VII. *DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998) ("A claim of discrimination on the basis of pregnancy must be analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII." (quoting *Boyd v. Harding Academy*, 88 F.3d 410, 413 (6th Cir. 1996) (internal alteration omitted))). Applying the usual Title VII analytical construct for sex discrimination claims, we first consider whether Young has shown any direct evidence of discrimination. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996). In the absence of that, we apply the familiar burden shifting framework articulated in *McDonnell Douglas* and subsequent cases. As Young's counsel clarified at oral argument, Young challenges the UPS policy as both direct evidence of discrimination and under the *McDonnell Douglas* framework. Accordingly, we assess the policy in both contexts.

### 1.

In asserting direct evidence of discrimination, Young points to both the UPS policy and to disparaging comments from

Myron Williams as indicative of UPS's general corporate animus against pregnant employees. Evidence is direct if it "both reflect[s] directly the alleged discriminatory attitude and . . . bear[s] directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (quoting *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc)). Thus, evidence is direct if it establishes discriminatory motive with no need for an inference or a presumption. We first consider the challenge to the UPS policy.

a.

Young contends that the UPS policy that does not provide light duty work to pregnant workers but does for certain other employees constitutes direct evidence of discrimination. It is certainly true that an explicit policy excluding pregnant workers would violate antidiscrimination law. *See* 29 C.F.R. § 1604.10(a) ("A written or unwritten employment policy or practice which excludes from employment applicants or employees because of pregnancy, childbirth or related medical conditions is in prima facie violation of title VII."). But no such policy exists here. By limiting accommodations to those employees injured on the job, disabled as defined under the ADA, and stripped of their DOT certification, UPS has crafted a pregnancy-blind policy, and Young does not contend otherwise. Such a policy is at least facially a "neutral and legitimate business practice," and not evidence of UPS's discriminatory animus toward pregnant workers. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 297 (4th Cir. 2010).

Young and the ACLU argue, however, that UPS's policy of accommodating certain employees but not pregnant workers who are otherwise allegedly similar in their ability or inability to work nonetheless runs afoul of the PDA. In particular, the ACLU contends that the PDA explicitly alters the traditional sex discrimination analysis under Title VII by restricting the

basis upon which employers may compare pregnant workers with nonpregnant workers. At its core, this argument posits that the PDA creates a cause of action distinct from that of § 703(a)[13] by compelling employers to grant pregnant employees a "most favored nation" status with others based on their ability to work, regardless of whether such status was available to the universe—male and female—of nonpregnant employees. Considering the history and structure of the PDA and the consequences of interpreting it in this way, we cannot agree.

Passed in 1978 to overrule the Supreme Court's decision in *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), the PDA added pregnancy-related discrimination to Title VII's general prohibition on sex discrimination. Congress placed the entirety of the PDA into the "Definitions" section of Title VII:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k). As the Supreme Court subsequently recognized, the PDA "makes clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983).

---

[13]Section 703(a) prohibits employers from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment [ ] because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

In addition to including pregnancy-related conditions within the definition of sex discrimination in its first clause, the PDA's second clause provides that "women affected by pregnancy . . . shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). Standing alone, the second clause's plain language is unambiguous. *See Int'l Union v. Johnson Controls*, 499 U.S. 187, 204-05 (1991) ("The second clause could not be clearer: it mandates that pregnant employees 'shall be treated the same for all employment-related purposes' as nonpregnant employees similarly situated with respect to their ability to work." (quoting *California Fed. Savings and Loan Ass'n. v. Guerra*, 479 U.S. 272, 297 (1987) (White, J., dissenting) (internal alterations omitted))). But the second clause does not stand alone; it follows the first clause. Confusion arises when trying to reconcile language in the first clause suggesting the PDA simply expands the category of sex discrimination (without otherwise altering Title VII), and language in the second clause suggesting the statute requires different—perhaps even preferential—treatment for pregnant workers.

Although the second clause can be read broadly, we conclude that its placement in the definitional section of Title VII, and grounding within the confines of sex discrimination under § 703, make clear that it does not create a distinct and independent cause of action. We further note the anomalous consequences a contrary position would cause: pregnancy would be treated more favorably than any other basis, including non-pregnancy-related sex discrimination, covered by Title VII.

Most courts to have considered the potential incongruence between the PDA's first and second clauses have concluded similarly. *See Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994) ("The Pregnancy Discrimination Act does not, despite the urgings of feminist scholars . . . require employers to offer maternity leave or take other steps to make

it easier for pregnant women to work. Employers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees . . . ." (citation omitted)); *see also Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 548-49 (7th Cir. 2011); *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 641 (6th Cir. 2006); *Spivey v. Beverly Enter., Inc.*, 196 F.3d 1309, 1312-13 (11th Cir. 1999); *Urbano v. Cont'l Airlines, Inc.*, 138 F.3d 204, 207-08 (5th Cir. 1998) ("By defining sex discrimination under Title VII to include pregnancy, Congress intended to do no more than 're-establish principles of Title VII law as they had been understood prior to the *Gilbert* decision,' and ensure that female workers would not be treated 'differently from other employees simply because of their capacity to bear children.'" (citations omitted)); *but see Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir. 1996) ("[W]hen a Title VII litigant alleges discrimination on the basis of pregnancy in violation of the PDA, in order to establish a prima facie case of discrimination, she must demonstrate only that another employee who is similarly situated in her or his ability or inability to work received more favorable benefits."). These courts reason that to find otherwise would be to transform an antidiscrimination statute into a requirement to provide accommodation to pregnant employees, perhaps even at the expense of other, nonpregnant employees.

Interpreting the PDA in the manner Young and the ACLU urge would require employers to provide, for example, accommodation or light duty work to a pregnant worker whose restrictions arise from her (off-the-job) pregnancy while denying any such accommodation to an employee unable to lift as a result of an off-the-job injury or illness. Under this interpretation, a pregnant worker who, like Young, was placed under a lifting restriction by her healthcare provider and could not work could claim that the PDA requires that she receive whatever accommodation or benefits are accorded to an individual accommodated under the ADA, because the pregnant worker and the other individual are sim-

ilar in their ability or inability to work—i.e., they both cannot work. By contrast, a temporary lifting restriction placed on an employee who injured his back while picking up his infant child or on an employee whose lifting limitation arose from her off-the-job work as a volunteer firefighter would be ineligible for any accommodation. Such an interpretation does not accord with Congress's intent in enacting the PDA, *see Armstrong v. Flowers Hosp.*, 33 F.3d 1308, 1317 (11th Cir. 1994)("Statements in the legislative history make it clear that the PDA does not require employers to extend any benefit to pregnant women that they do not already provide to other disabled employees."), and would thus imbue the PDA with a preferential treatment mandate that Congress neither intended nor enacted, *see Urbano*, 138 F.3d at 208 ("[Plaintiff]'s claim is thus not a request for relief from discrimination, but rather a demand for preferential treatment; it is a demand not satisfied by the PDA.").

We are unpersuaded that *Ensley-Gaines*, on which Young and the ACLU as amicus rely, effects the watershed change they ascribe to it. Although the court in *Ensley-Gaines* stated the second clause "explicitly alters the analysis to be applied in pregnancy discrimination cases," 100 F.3d at 1226, it analyzed the plaintiff's challenge to the United States Postal Service's policy—a policy akin to the one challenged here—not as direct evidence of sex discrimination, but as circumstantial evidence under the *McDonnell Douglas* framework. *See Reeves*, 446 F.3d at 641 n.1 (noting *Ensley-Gaines* primarily concerned whether the plaintiff had established a prima facie case under the Title VII analysis). Moreover, given the troubling consequences just outlined of interpreting the PDA in this broad manner, *see Urbano*, 138 F.3d at 208 ("The impact of *Ensley-Gaines* is unequivocally to treat pregnant employees who need light duty work better than other employees with a similar medical need whose conditions arose off-the-job."), it is unsurprising that no other circuit has followed *Ensley-Gaines*. We are similarly compelled to disagree with its analysis.

We therefore adhere to the majority view that where a policy treats pregnant workers and nonpregnant workers alike, the employer has complied with the PDA. The UPS policy at issue is not direct evidence of pregnancy-based sex discrimination.

b.

We next consider whether Myron Williams's comments demonstrate "corporate animus" on the part of UPS tantamount to direct evidence of discrimination.[14] Young focused below on Williams's comments alone, but now contends those comments amount to evidence of UPS's "corporate animus." The district court rejected her previous argument on the ground that Williams wielded no decisionmaking power over Young.[15] *See* J.A. 402; *see also Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288-89 (4th Cir. 2004) (noting that although "the person allegedly acting pursuant to a discriminatory animus need not be the 'formal decisionmaker' to impose liability upon an employer for an adverse employment action," the plaintiff must present "sufficient evidence to establish that the subordinate was the one 'principally responsible' for, or the 'actual decisionmaker' behind, the action"). Young's argument on appeal that Williams's comments manifest UPS's corporate animus towards pregnant workers finds no support in the record; Williams's statements stand alone as the only explicit evidence of a pregnancy-related comment, derogatory or otherwise. Moreover, Young's reliance on *Merritt*, 601 F.3d 289, and *Staub v. Proc-*

---

[14]Although Williams denies telling Young that her pregnancy made her a liability and that she should return home until she was no longer pregnant, the procedural posture of this case requires us to accept as true Young's account.

[15]In fact, Young argues that "it is misguided to look to *either* Martin *or* Williams as 'the' decisionmaker;" each of them was simply "enforc[ing] [UPS's] standing policy by announcing that Young must go home." Appellant's Br. at 54. Thus, Young's "corporate animus" argument is in essence another attack on UPS's policy.

*tor Hosp.*, 131 S. Ct. 1186 (2011), is inapposite as those cases involved non-decisionmaker colleagues whose pervasive animus for the plaintiff influenced the ultimate decisionmaker. No such evidence exists here: Williams neither possessed the authority to make determinations about Young's employment nor sought to influence Martin, who did.[16]

2.

Because Young presents no direct evidence of pregnancy discrimination, we next consider whether she offers evidence sufficient to make out a prima facie case under the *McDonnell Douglas* framework. Under this framework, Young must establish a prima facie case of sex discrimination on her pregnancy claim by showing "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *Gerner v. Cnty. of Chesterfield*, 674 F.3d 264, 266 (4th Cir. 2012) (quoting *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir.2004)) (internal alterations omitted).[17] Again, the focus of her challenge is the UPS policy.

Young fell within the protected class, raised at least a genuine issue of material fact regarding her job performance,[18] and

---

[16]The single statement Young offers from a co-worker suggesting "nobody would have stopped" a manager like Williams from placing Young on light duty because "[t]hat is just how it works," *see* J.A. 539, is insufficient to create a genuine issue of disputed material fact. Even assuming Williams did have such authority to decide whether Young should be given light duty, Young offers no reason to conclude that he would or should have interpreted UPS policy regarding the availability of light duty for pregnant employees any differently than Martin did.

[17]We have also described the fourth prong as considering whether the allegedly adverse employment action occurred "under circumstance[s] giving rise to an inference of unlawful discrimination." *Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir. 2004).

[18]UPS argues that Young cannot satisfy the second element of the prima facie case because the lifting restriction rendered her unqualified for an air

suffered an adverse employment action when she could not continue working. Thus, the dispute here centers on the final element of the prima facie case: whether similarly-situated employees outside the protected class received more favorable treatment than Young, or more broadly, whether UPS's decision to prevent Young from either receiving an accommodation or returning to work occurred "under circumstance[s] giving rise to an inference of unlawful discrimination." *Mackey*, 360 F.3d at 468. In particular, Young and UPS sharply disagree about who constitutes an appropriate "comparator" in this context.

At bottom Young seeks to compare herself to employees accommodated under the ADA, drivers who have lost their DOT certification for medical reasons, and employees injured on the job. As we have already noted, however, these accommodations were created by a neutral, pregnancy-blind policy—a policy she can attack indirectly no more successfully than she could directly.

Moreover, we conclude that a pregnant worker subject to a temporary lifting restriction is not similar in her "ability or inability to work" to an employee disabled within the meaning of the ADA or an employee either prevented from operating a vehicle as a result of losing her DOT certification or injured on the job. Young is dissimilar to an employee disabled under the ADA for the same reason she herself was not disabled: her lifting limitation was temporary and not a significant restriction on her ability to perform major life activities. She is

driver position. *See* Appellant's Br. at 48-51. UPS raised this argument below, *see* J.A. 168-69, but the district court did not address it. Although there is (out-of-circuit) case law supporting UPS's position, *see Spivey*, 196 F.3d at 1312 ("The [twenty-five pound] lifting restriction imposed on [the plaintiff] clearly prevented her from performing the responsibilities required of this position."), the record also indicates Young may have been able to perform satisfactorily even with the restriction. At a minimum, this is a disputed issue of material fact inappropriate for a court to decide at the summary judgment stage.

unlike employees guaranteed an inside job or light duty under the CBA provision[19] for drivers who have lost DOT certification for at least two reasons. First, no legal obstacle stands between her and her work. A driver who has lost his or her DOT certification is legally disabled from operating a vehicle; Young's physical impairment only restricted her ability to lift. Second, as the district court observed, "those with DOT certification maintained the ability to perform any number of demanding physical tasks, while Young labored under an apparent inability to perform tasks involving lifting." J.A. 411. Finally, Young is not similar to employees injured on the job because, quite simply, her inability to work does not arise from an on-the-job injury. The CBA provision requiring UPS to accommodate those employees injured while carrying out job duties for the company but not while pursuing other activities reasonably places a heightened obligation on UPS to accommodate the former group. The PDA does not render this distinction unlawful.

We are also unpersuaded that Martin's decision occurred under circumstances "giving rise to an inference of unlawful discrimination." *Mackey*, 360 F.3d at 468. According to Young, these circumstances consist of (1) Martin's solicitation of a doctor's note from Young identifying her restrictions; (2) Martin's statement that UPS policy did not provide light duty for pregnant workers; and (3) Williams's comments about Young as a liability while pregnant. However, with the exception of Williams's comments, which played no role in Martin's decision, these facts fail to demonstrate the specific animus Young ascribes to them. Even assuming Martin solicited a note from Young, there is no indication that this was not done with all employees returning from leave, or that Martin did so *because* Young was pregnant. And Martin's statement about UPS's policy providing light duty in three

---

[19]Although Young also contends that the CBA was negotiated and interpreted with discriminatory animus, she presents no support for this contention in the record.

instances—but not for pregnancy—is simply one of fact. One may characterize the UPS policy as insufficiently charitable, but a lack of charity does not amount to discriminatory animus directed at a protected class of employees.

Accordingly, we conclude that Young cannot establish that similarly situated employees received more favorable treatment than she did, and therefore cannot establish the fourth element of the prima facie case for pregnancy discrimination. While not unsympathetic to Young's circumstances, we are nevertheless concerned about the problematic potential of creating rights not grounded in the text and structure of Title VII as a whole.

### III.

We therefore affirm the decision of the district court.

*AFFIRMED*